Luis A. RODRIGUEZ, on behalf of himself and all other persons similarly situated, Appellant in No. 76–2609,

v.

Lewis S. TAYLOR, Individually and in his official capacity as Director of Personnel of the City of Philadelphia,

Hillel S. Levinson, Individually and in his official capacity as Managing Director of the City of Philadelphia,

Frank L. Rizzo, Individually and in his official capacity as Mayor of the City of Philadelphia and the City of Philadelphia, Appellants in Nos. 76–2610 and 76–2611.

Nos. 76–2609–76–2611.

United States Court of Appeals, Third Circuit.

Argued Sept. 9, 1977.

Decided Dec. 27, 1977.

Andrew F. Erba, Sheryl Dicker, Community Legal Services, Inc., Philadelphia, Pa., for appellant in Nos. 76–2609 and appellees in Nos. 76–2610 and 76–2611.

Tyler E. Wren, James M. Penny, Jr., Asst. City Sols., Sheldon L. Albert, City Sol., City of Philadelphia, Law Dept., Philadelphia, Pa., for appellants in Nos. 76–2610 and 76–2611 and appellee in No. 76–2609.

OPINION OF THE COURT

Before ADAMS, VAN DUSEN and HUNTER, Circuit Judges.

VAN DUSEN, Circuit Judge.

This appeal raises diverse issues resulting from a district court award of back pay, liquidated damages and attorneys' fees to a plaintiff who successfully proved that the City of Philadelphia violated the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621–634 (1970 & Supp. IV 1974) (ADEA). We affirm in part and reverse in part the district court's award of monetary relief and attorneys' fees.

I.

Plaintiff, Luis Rodriguez, then age 46, applied on December 23, 1974, to the City of Philadelphia to take the competitive Civil Service examination for the position of Security Officer I. One month later, the City's Personnel Department informed Mr. Rodriguez that he could not sit for the examination because he was overage. Since 1966, the City of Philadelphia had adhered to a personnel policy requiring that applicants for the position of Security Officer I be less than 41 years of age in order to be eligible to take the requisite competitive examination.[1] Impelled by his rejection, and having exhausted federal and state administrative remedies, Mr. Rodriguez brought suit on behalf of himself and all other persons over the age of 41 against the City of Philadelphia (City) in the Eastern District of Pennsylvania. The gist of plaintiff's complaint alleged that the City's inflexible maximum age requirement for Security Officer I applicants violated the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621–634 (1970 & Supp. IV 1974).[2] The complaint sought class relief in

1. The City's maximum age restriction applied only to prospective candidates for the position of Security Officer I. Employees hired before the age of 41 were not retired or reassigned on reaching age 41. At the time of Mr. Rodri-guez's application, the City employed several officers older than 41.

2. The plaintiff's complaint also raised claims under 42 U.S.C. § 1983 and the Fourteenth Amendment, as well as a pendent state claim

the nature of a permanent injunction proscribing enforcement of the City's age limit and individual relief for Mr. Rodriguez in the form of an opportunity to take the competitive examination and an entitlement to recovery of pecuniary losses.[3]

The district court certified the class pursuant to Rule 23(b)(2), and, after a non-jury trial, concluded that the City's policy of barring persons over the age of 41 from taking the competitive examination for the job of Security Officer I violated § 4(a)(1) of the ADEA, 29 U.S.C. § 623(a)(1), and was not a bona fide occupational qualification, *see* 29 U.S.C. § 623(f)(1). Accordingly, the district court ordered the requested class injunctive relief[4] but did not order any monetary relief to the class members other than the named plaintiff. Also, it granted the plaintiff an opportunity to take the examination he would have taken had he not been disqualified on the basis of his age. Were the plaintiff to score high enough to have been hired, but for his age, sometime between his original application and the time of trial, a period of one year and a half, he would have been entitled to the position of Security Officer I with full retroactive benefits. Whether or not Mr. Rodriguez proved to be successful on the exam, the district court awarded him, under § 7(b) of ADEA, 29 U.S.C. § 626(b), amounts owing as unpaid wages for the period between the date the first applicant was hired subsequent to the plaintiff's rejection and the date the final order was

issued. The district court further ruled that because the City's violation was willful, the plaintiff was entitled to liquidated damages in the amount of the calculated unpaid minimum wages, *see* 29 U.S.C. § 626(b).[5] The district court ruled that the plaintiff, "having proved the violation, is not required to prove that 'but for' the violation he would have been hired in order to be entitled to an award of money both as an 'amount owing' to him and as liquidated damages" (119a). In a subsequent memorandum opinion of October 5, 1976, the district court awarded plaintiff's counsel, Community Legal Services, Inc., $2,820. in attorneys' fees.

The City has taken no appeal from the district court's conclusions of law that the personnel policy erecting age as a barrier to application for the position of Security Officer I willfully violated the ADEA and was not saved as a bona fide occupational qualification. Thus, for purposes of this appeal, the City stands as an undisputed willful violator of the ADEA, both with respect to the plaintiff, Luis Rodriguez, and the class of persons over age 41 which he represented. The City in this appeal challenges only certain aspects of the individual relief ordered by the district court.[6] The City contends that Mr. Rodriguez did not suffer pecuniary losses as a result of its discriminatory refusal to administer the employment examination and, therefore, he was not entitled to an unconditional award of

---

said to arise under the Pennsylvania Human Relations Act, Pa.Stat.Ann. tit. 43, §§ 951 *et seq.* (Purdon) (1964). The district court rested liability solely on the basis of violation of pertinent provisions of the ADEA, obviating any consideration by this court of other possible sources of liability and concomitant relief.

3. Plaintiff's complaint requested an order placing him on the hiring list only if successful in the examination and "if hired to grant him back wages, retroactive benefits and seniority" (clause d, p. 12a). The complaint also added an open-ended request for whatever other relief the district court deemed fit and proper (clause f, p. 13a).

4. The district judge supplemented his injunction barring enforcement of the age requirement by ordering certain corrective measures designed to publicize his order and to encour-

age middle-aged persons to sit for a new examination to be held to fill subsequent vacancies.

5. In describing his formula for calculating the back pay award, the district judge made no provision for offsetting any wages earned in the interim period between the rejection of plaintiff's application and trial.

6. The City has not appealed the prospective non-monetary injunctive relief granted the class. In light of its acquiescence, we pretermit consideration of the City's assertion that under the ADEA class actions may only be maintained if class members affirmatively "opt in" in contrast to the Federal Rules of Civil Procedure Rule 23(c) "opt out" provision. *See* appellant's brief at p. 5, n. 1.

unpaid wages or liquidated damages. The City also contends that the district court erred in not reducing the plaintiff's monetary award to account for wages he earned from other sources during the interim period for which back pay was calculated.

Furthermore, the City also appeals that portion of the district court's order entitling Mr. Rodriguez to be hired as a Security Officer I solely on the basis of his written examination performance. The City urges that the plaintiff's hiring should have been made contingent on his satisfaction of preexisting physical requirements for employment as a Security Officer I. Finally, the City maintains that the district court erred in awarding attorneys' fees under the ADEA to plaintiff's counsel, Community Legal Services. The plaintiff, while disputing all the grounds of appeal advanced by the City, has cross-appealed the calculation of attorneys' fees. The plaintiff contends that the district court employed incorrect standards in calculating the reasonable value of his attorneys' time devoted to this litigation.

■ At oral argument it was revealed that pursuant to the district court's order, Mr. Rodriguez was administered the competitive written examination for the job of Security Officer I, but that he failed to score high enough to have been hired during the time between rejection of his application and trial.[7] Mr. Rodriguez's examination failure moots the City's contention that he should not be hired without also passing a physical examination.[8] In view of Mr. Rodriguez's failure on the civil service

exam, the district court's order will enable him to collect unpaid wages for a job for which he may have been unqualified on grounds other than his age. For the reasons stated below, we hold that the district court did not err in awarding both back pay and liquidated damages to Mr. Rodriguez. However, we conclude that the district court did err in not setting off wages earned during the same period for which back pay was calculated. Thus, we remand for a recalculation of the monetary relief accorded Mr. Rodriguez.[9] The district court similarly erred in the manner in which it calculated attorneys' fees which we hold Community Legal Services is entitled to under the mandatory attorneys' fees award provision of the ADEA.

II.

The Age Discrimination in Employment Act of 1967 was enacted to ensure that employers base their hiring decisions on expectations of individuals' job performance rather than on unwarranted irrebuttable presumptions that all persons of a certain age less than 65 would be unable to satisfactorily perform a given job. Age became a proscribed basis for employment decisions in much the same manner as Title VII of the 1964 Civil Rights Act, 42 U.S.C. §§ 2000e *et seq.* (1970 & Supp. IV 1974), had earlier prohibited employment discrimination on the basis of other immutable personal characteristics such as race, color, religion, sex or national origin. Age concededly differs from the Title VII classifications in that, for some jobs, statistically significant correlations might demonstrate that

---

**7.** It is unclear whether Mr. Rodriguez failed absolutely in receiving a score so low as to preclude his employment even were there unfilled vacancies or that he only failed relatively in scoring below those persons actually hired during the interim period.

**8.** The district court's order would have hypothetically circumvented the City's alleged independent physical examination requirement only with respect to Mr. Rodriguez, who was the only person ordered hired solely on the basis of his written test performance. As regards all other future hiring, the district court did not preclude the City from establishing and enforcing bona fide job-related physical qualifica-

tions. Thus the City's argument that Mr. Rodriguez should have been required to submit to a physical examination has been mooted by the conjunction of the district court's order and Mr. Rodriguez's failure to pass the written exam.

**9.** The district court assessed liquidated damages in an amount equal to the underlying award of unpaid wages. Thus, insofar as the district court on remand may reduce the back pay award by setting off interim earnings, the equivalent liquidated damages penalty must be likewise reduced.

persons above certain middle ages are inherently disabled from performing as satisfactorily as their younger counterparts. Congress recognized the likelihood of legitimate connections between age and ability and saved from its statutory strictures employment decisions "where age is a bona fide occupational qualification reasonably necessary to the formal operation of the particular business . . .," § 4(f) of the ADEA, 29 U.S.C. § 623(f) (1970).

At trial, the plaintiff presented uncontroverted evidence that the City had established an absolute age limit of 41 for applicants for the position of Security Officer I. The plaintiff's evidence conclusively proved that his application for such a job had been rejected solely on the basis of his overage. Moreover, the City presented at trial no evidence indicating that Mr. Rodriguez was in any way unqualified for a job as a security guard or that there had not been vacancies which he might have filled. The City's evidence that its maximum age limit was a bona fide occupational qualification was found wanting by the district court and is not reiterated on appeal. Thus, the posture of plaintiff's suit as it stands before this court is that the City has committed a willful per se violation of the ADEA, *see Houghton v. McDonnell Douglas Corp.,* 533 F.2d 561 (8th Cir.) *cert. denied,* —— U.S. ——, 98 S.Ct. 506, 54 L.Ed.2d 451 (1977). Notwithstanding its indisputable liability, the City now claims that the district court's grant of legal relief to Mr. Rodriguez was unauthorized by statute.

### A.

Relief available to victims of unlawful age discrimination is governed by § 7 of the ADEA, 29 U.S.C. § 626 (1970), in conjunction with its incorporated enforcement provisions of the Fair Labor Standards Act (FLSA). *See* 29 U.S.C. § 626(b), *incorporating* 29 U.S.C. §§ 211(b), 216(b), 216(c), 217, 626(b), 626(c). The FLSA makes actionable employer violations of minimum wage and maximum hour laws and entitles aggrieved employees to recover "unpaid minimum wages" or "unpaid overtime compensation,"

as well as an equal amount of mandatory "liquidated damages." 29 U.S.C. § 216(b) (1970). Violations of the ADEA do not typically involve an employer's failure to pay minimum or overtime wages. A discriminatory refusal to hire or promote workers on the basis of age is likely to result in monetary damages less precisely measurable. Section 7(b) of the ADEA defines available monetary relief only in terms of "amounts owing to a person as a result of a violation of this chapter." Such amounts "shall be enforced" as are unpaid minimum wages and unpaid overtime compensation under the FLSA enforcement provisions incorporated by reference. *See* 29 U.S.C. § 626(b). Liquidated damages under the ADEA are available only in case of "willful violations" of the statute. In addition, § 7(b) empowers the courts to grant such "legal or equitable relief as may be appropriate to effectuate the purposes of this chapter, including without limitation judgments compelling employment, reinstatement or promotion, or enforcing the liability for amounts deemed to be unpaid minimum wages or unpaid overtime compensation under this section."

The "amounts owing" to a victim of age discrimination are not further defined by statute. Thus, the scope of pecuniary relief available under the ADEA must be ascertained from examination of the whole statutory scheme. Damage standards should effectuate the purposes of anti-discrimination statutes. *See generally Rogers v. Exxon Research & Engineering Co.,* 550 F.2d 834, 839–42 (3d Cir. 1977).

Monetary awards exacted from employers who practice unlawful discrimination serve two primary functions. First, the prospect of economic penalties more certainly deters illegal employment practice than does exposure to injunctive relief or prospective equitable remedies such as reinstatement. Second, economic exactions recompense individuals for injuries inflicted by employers' discriminatory conduct. These prophylactic and compensatory purposes are the basis of most recent anti-employment discrimination legislation, including the

ADEA and Title VII. *See Albemarle Paper Co. v. Moody,* 422 U.S. 405, 417–21, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); H.R.Rep. No. 805, 90th Cong., 1st Sess. 2 (1967), U.S.Code Cong. & Admin.News 1967, p. 2213. Thus, the Supreme Court's mandate on the exercise of trial court's discretion in granting monetary relief in Title VII suits, as stated in *Albemarle, supra,* is equally compelling in the context of ADEA actions:

> "[G]iven a finding of unlawful discrimination, back pay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination."

422 U.S. at 421, 95 S.Ct. at 2373.

■ The make whole standard of relief should be the touchstone for the district courts in fashioning both legal and equitable remedies in age discrimination cases. Victims of discrimination are entitled to be restored to the economic position they would have occupied but for the intervening unlawful conduct of employers. *See Franks v. Bowman Transportation Co.,* 424 U.S. 747, 763–64, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976) (Title VII standard). The difficulty arises in applying the concepts of a make whole restorative remedy and, but for causation, to facts developed in particular cases. Trial courts and the parties themselves invariably lack perfect hindsight to forecast what would have happened had there been no unlawful acts. Even in those cases where a retrospective fact finder can confidently determine where a plaintiff would have stood had there been no discrimination, the plaintiff is subjected, for often long periods of time prior to trial, to burdensome uncertainty.

For example, in the case at hand, Mr. Rodriguez did not and could not have known at the time of his application whether he would have obtained a job as Security Officer I had the City not unlawfully rejected his application. The City might have immediately discovered Mr. Rodriguez's true qualifications had they simply administered the examination prior to trial, thereby adducing direct evidence on Mr. Rodriguez's ability to perform the job of a security guard. Even by the time of trial, the parties had no evidence that Mr. Rodriguez was unqualified on grounds other than age. Given what the trial court did know on the basis of evidence introduced at trial, a dispositive issue on appeal is whether the trial court erred in awarding Mr. Rodriguez back pay unconditioned by his future performance on a competitive, written examination.

■ Resolution of this focal issue requires examination of the substantive and evidentiary rules governing retrospective compensatory relief. A substantive rule requiring recipients of back pay to have been able to satisfy all prior job qualifications except unlawful age standards is consistent with commonly understood meanings of make whole relief and but for causation. If an applicant would not have been hired because of a legitimate disqualification, then any lost wages are not properly attributable to unlawful age discrimination.[10] Consistent application of such a substantive rule in the context of diverse employment discrimination cases requires careful allocations of the evidentiary burdens of proof. Evidence of what might have happened will often be incomplete or in dispute.

In civil litigation generally, the plaintiff must present a quantum of evidence sufficient to withstand a defense motion for a directed verdict.[11] On those basic facts crucial to the plaintiff's case, he or she is said to bear the burden of production or of going forward.[12] The operation of presumptions in conjunction with burdens of

---

10. See *Stewart v. General Motors Corp.,* 542 F.2d 445, 451–53 (7th Cir. 1976); *Brennan v. Ace Hardware Corp.,* 495 F.2d 368, 373–74 (8th Cir. 1974); *Baxter v. Savannah Sugar Refining Corp.,* 495 F.2d 437, 443–45 (5th Cir.), *cert. denied,* 419 U.S. 1033, 95 S.Ct. 515, 42 L.Ed.2d 308 (1974).

11. C. McCormick, Handbook on the Law of Evidence, §§ 337, 338 (2d ed. 1972).

12. See authorities cited at 90 Harv.L.Rev. at 389 n. 53.

production to implement substantive rules of law is especially prominent in the context of establishing liability for employment discrimination. To facilitate enforcement of Title VII and ADEA, courts have recognized certain presumptions and production burdens which have influenced the development of liability rules.[13] Recognition of evidentiary presumptions and burdens of proof will similarly clarify standards for the measurement of damages in ADEA actions.

In order to establish an employer's liability, Title VII plaintiffs, as an initial matter, need only present a prima facie case of employment discrimination. Plaintiffs satisfy their burden of production if they show that they are members of a protected class and that they were rejected for job vacancies for which they were qualified. Plaintiffs need not submit proof that a discriminatory motive underlay an employer's decisions. The burden of production then shifts to the defendant to adduce evidence of non-discriminatory motivation. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 800–03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Ostapowicz v. Johnson Bronze Co.,* 541 F.2d 394, 399–400 (3d Cir. 1976); *Baxter v. Savannah Sugar Refining Corp.,* 495 F.2d 437, 443–45 (5th Cir.), *cert. denied,* 419 U.S. 1033, 95 S.Ct. 515, 42 L.Ed.2d 308 (1974). Absent such rebuttal evidence, courts presume unlawful discriminatory purpose. Moreover, if an employer produces evidence of a non-discriminatory reason for an employment decision, he may bear the burden of persuasion on that ultimate issue.[14] Thus, under Title VII the courts have developed a set of shifting evidentiary burdens and presumptions that facilitates proof of employer's liability. *See Intnt'l B'hood of Teamsters v. United States,* 431 U.S. 324, 357–62 & nn. 44–46, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).

■ Under the ADEA also plaintiffs are held to a production burden of presenting only a prima facie case of age discrimination. *See, e. g., Hodgson v. First Federal Sav. & Loan Ass'n,* 455 F.2d 818 (5th Cir. 1972). On presentation of a prima facie case, the burden of production shifts to the employer to justify differential treatment of older workers on a basis other than age.[15] Thus, liability under ADEA is enforced by means of evidentiary rules facilitating plaintiff's proof of an employer's discriminatory purpose.

■ The case at hand advances us beyond proven liability to the matter of evidentiary rules for the individualized relief phase of ADEA actions. Just as with the underlying liability determination, the twin objectives of monetary relief—deterring discrimination and making victims of discrimination whole—are furthered by judicial recognition of evidentiary presumptions and burdens of proof designed to resolve uncertainties in favor of the aggrieved employee or applicant. Thus, we hold, in view of this record which *inter alia* awards back pay only to an individual plaintiff, not to a class of numerous applicants, that an employee who has prevailed in proving that an employer committed a per se violation of the ADEA shoulders the initial burden of

---

13. See Note, The Age Discrimination in Employment Act of 1967, 90 Harv.L.Rev. 380, 388–99 (1976).

14. The majority of circuits have construed the *Green* case as shifting the burden of persuasion to the defendant employer once a plaintiff presents a prima facie case of employment discrimination. *See, e. g., Ostapowicz v. Johnson Bronze Co.,* 541 F.2d 394, 399 (3d Cir. 1976); *Johnson v. Goodyear Tire & Rubber Co.,* 491 F.2d 1364, 1380 (5th Cir. 1974); *Gates v. Georgia-Pacific Corp.,* 492 F.2d 292, 295–96 (9th Cir. 1974); *Vulcan Soc'y of the New York City Fire Dept. v. Civil Serv. Comm'n of New York,* 490 F.2d 387, 393 (2d Cir. 1973). *But see Long v.*

*Ford Motor Co.,* 496 F.2d 500, 505–06 (6th Cir. 1974); *Gilliam v. City of Omaha,* 388 F.Supp. 842, 848 (D.Neb.), *aff'd,* 524 F.2d 1013 (8th Cir. 1975).

15. United States Courts of Appeals have differed as to whether the plaintiff or defendant bears the burden of persuasion if conflicting or equivocal evidence on discriminatory purpose is submitted to the jury. *Compare Hodgson v. First Fed. Sav. & Loan Ass'n,* 455 F.2d 818, 822 (5th Cir. 1972) (burden shifts to employer), *with Laugesen v. Anaconda Co.,* 510 F.2d 307, 312–13 (6th Cir. 1975). *See also* Note, *supra* note 13, at 390–99.

production to present a prima facie case of entitlement to damages. This burden is discharged upon a showing that at the time of the unlawful discrimination (1) vacancies existed from which plaintiff was impermissibly excluded, and (2) that the plaintiff possessed physical and mental capabilities generally required of employees performing the type of work for which he applied. Upon such a showing the burdens of production and persuasion shift to the employer to prove that the plaintiff would not have been hired even absent discriminatory age barriers. The defendant must, therefore, adduce evidence of either no job vacancies or plaintiff's lack of qualifications for the particular job.[16]

■ Mr. Rodriguez presented evidence at trial of existing vacancies for the job of Security Officer I that were filled by other applicants hired subsequent to his rejection. Mr. Rodriguez was also portrayed to the district court as a man generally qualified to perform security guard tasks. He had occupied similar positions both before and after his rejected application to the City. The trial court found Mr. Rodriguez sound of body and mind. Findings of Fact # 9, district court opinion reprinted at 115a. On the trial record as a whole, we conclude that Mr. Rodriguez satisfied his burden of production and proved a prima facie case of entitlement to damages. Moreover, there is no evidence on the record that the City rebutted plaintiff's prima facie case with proof of either Mr. Rodriguez's disqualifying mental attributes or his inability to pass any City examination. The City, with its silence in the face of plaintiff's prima facie case, simply did not meet its burden of rebuttal on the issue of whether Mr. Rodriguez would have been hired as a Security Officer but for the unlawful age discrimination. Thus, the district court did not err in its allocation of evidentiary burdens, nor did it err in concluding that plaintiff had proven his entitlement to a back pay award.[17]

The City might well have satisfied its burden of production and conclusively settled the ultimate issue of Mr. Rodriguez's qualifications had they only administered to him the written civil service exam prior to trial. Instead, the City failed to promptly administer the written exam precluding development of material evidence on this issue until after trial. The importance of requiring employers to adhere to their evidentiary burdens at trial is underscored by consideration of the consequences of delaying final determinations of Mr. Rodriguez's back pay award until the exam was taken.

During the period between the discriminatory employment decision and trial, Mr. Rodriguez faced considerable uncertainty as to whether he would eventually be adjudged entitled to back pay and/or future employment. Where a rejected job applicant, such as Mr. Rodriguez, was reasonably certain that an employer discriminated against him or her on the basis of age alone, that employee would have a reasonable expectation of subsequent vindication and relief. The applicant would be deterred from seeking interim employment or a more permanent position lest it interfere with his opportunity to gain the preferred job from which he was unlawfully rejected. Signifi-

---

16. Our holding is consistent with a host of United States Courts of Appeals decisions placing the burden on employees to prove disqualification of an employee seeking back pay under Title VII. See, e. g., Richerson v. Jones, 551 F.2d 918, 924–25 (3d Cir. 1977); Stewart v. General Motors Corp., 542 F.2d 445, 452 (7th Cir. 1976); United States v. United States Steel Corp., 520 F.2d 1043 (5th Cir. 1975); Baxter v. Savannah Sugar Refining Corp., 495 F.2d 437, 444–45 (5th Cir.), cert. denied, 419 U.S. 1033, 95 S.Ct. 515, 42 L.Ed.2d 308 (1974); Pettway v. American Cast Iron Pipe Co., 494 F.2d 211, 259–60 (5th Cir. 1974); Johnson v. Goodyear Tire & Rubber Co., 491 F.2d 1364, 1380 (5th Cir. 1974).

17. We read the district court's cryptic conclusion of law that Mr. Rodriguez did not have "to prove that 'but for' the violation he would have been hired in order to be entitled to an award of money . . .," district court opinion, ¶ 9, reprinted at 119a, as consistent with our fuller explication of the relevant evidentiary burdens. The City's unresponsive evidence was insufficient to withstand a directed verdict against it on the subject of entitlement to damages had the matter been tried to a jury.

cantly, making future employment conditioned on current qualifications does not place so harsh a burden of uncertainty on the discriminated against applicant. After Mr. Rodriguez failed to pass the court-ordered exam, he could freely seek other future employment without sacrifice of opportunities. But for the interim period prior to trial, Mr. Rodriguez cannot now make up his lost, past opportunity to seek alternative employment. Had the City administered and graded the exam shortly after his application, and had the results been the same, Mr. Rodriguez could have more determinedly pursued other employment.[17a]

■ We do not advocate that courts attempt to measure the emotional costs of the uncertainty faced by a rejected applicant such as Mr. Rodriguez. We have previously rejected claims that ADEA authorizes recompense for psychic distress attributable to unlawful age discrimination. *Rogers v. Exxon Research & Engineering Co.*, 550 F.2d 834, 839–42 (3d Cir. 1977). However, compensatory relief as measured solely by lost wages should be awarded pursuant to rules and procedures which reflect and min-

imize the burdens of uncertainty. On the facts of this case, involving a damage award to an individual applicant, rather than to a class, requiring the defendant employer to come forward with evidence at trial of specific factors, such as low test scores, which would have disqualified an applicant irrespective of discrimination best effectuates the restorative principle of make whole relief.[18]

Our recognition of a prima facie case for entitlement to back pay conforms to the Supreme Court's recent explications of evidentiary presumptions and burdens of proof governing individual claims for retroactive seniority relief in Title VII actions. In *Franks v. Bowman Transportation Co.*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976), the Court considered whether individual unnamed members of the class of black non-employee applicants for positions as over-the-road (OTR) truck drivers could be awarded retroactive seniority on proof that the employer engaged in a pattern of discriminatory hiring practices violative of Title VII.[19] The district court had denied

**17a.** On the other side of the balance, administration of a standardized examination to a single candidate would not have been costly to the City nor would it have unduly complicated its hiring process. In situations of multiple applicants for a single or a few job openings, where some of the applicants are unlawfully rejected solely because of age, the consequences of not promptly administering qualification tests to those discriminated against may be substantially different. Success on an exam or in an interview may not provide a reasonable expectation of being selected from a large pool of other well qualified applicants for a limited number of vacancies. Moreover, administration of exams or conducting of interviews may be unduly burdensome to the employer. Assessment of the consequences in this latter situation of a class of numerous applicants should be evaluated on a concrete set of facts.

**18.** Further factors militating in favor of a prima facie entitlement to back pay concerns the nature of proof of an applicant's qualifications. In the instant case, the City wished to rely on a civil service exam from which an applicant's performance could be objectively marked and measured against competitors. Other employers might administer more subjectively graded exams. The more subjective an evaluation is, the greater is the need for an employer to come forward with it at trial. Such evaluations may

provoke challenges by the plaintiff, which should be resolved at trial rather than at a second proceeding. Moreover, challenges to the legitimacy of employment tests are also facilitated by evidentiary rules which require all relevant evidence to be developed at an initial trial, rather than in a subsequent proceeding, which would merely protract the applicant's uncertainty. Finally, in other cases the interval of time between application and trial may be so long as to cast doubts on the equivalence of testing periods. Where time may dissipate an individual's chances of scoring highly on an exam, evidentiary rules may beneficially encourage employers to administer exams promptly despite age barriers.

**19.** The district court had permanently enjoined the employer and certain labor unions from perpetuating discriminatory practices found to exist. The district court had refused to award any individual legal relief to unnamed members of the class. The court of appeals reversed in part, holding that back pay could be awarded to members of the separate classes of non-employee applicants and employee applicants denied transfer to OTR jobs. *Franks v. Bowman Transportation Co.*, 495 F.2d 398 (5th Cir. 1974). The court of appeals also authorized the award of retroactive seniority to members of the class of employees who sought transfer

seniority benefits claims to the class because "such claims 'presuppose a vacancy, qualification and performance by every member. There is no evidence on which to base these multiple conclusions. . . .'" *Id.* at 772, 96 S.Ct. at 1267. The Court ruled that such concern should not bar relief to the entire class but would be material to individual claims for relief. After noting that the make-whole objective of Title VII should govern the trial court's discretion in awarding legal relief, *id.* at 762–66, 96 S.Ct. 1251, the Court allocated the requisite burdens of production in cases where individual class members seek retroactive seniority:

> "[P]etitioners [non-employee applicants] here have carried their burden of demonstrating the existence of a discriminatory hiring pattern and practice by the respondents [employer] and, therefore, the burden will be upon respondents [employer] to prove that individuals who reapply were not in fact victims of previous hiring discrimination."

*Id.* at 772, 96 S.Ct. at 1268 (citations omitted).

Finally, the Court emphasized that the employer, to defeat individual claims for relief, would bear the burden of proof on the lack of vacancies and an "individual's lack of qualification . . . under nondiscriminatory standards *actually applied* to individuals who were in fact hired." *Id.* at 773 n. 32, 96 S.Ct. at 1268 (emphasis in original).[20]

In *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 357–62, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), the Supreme Court reiterated that the evidentiary rules prescribed in *Franks* created a rebuttable presumption that individual members of a class subjected to a pattern of discriminatory hiring practices are entitled to relief. In *Teamsters,* the Court justified the presumption in favor of individual relief on the ground that the employer stood as a "proven wrongdoer" and controlled access to proof of matters such as an applicant's qualifications. *See id.* at 359 n. 45, 97 S.Ct. 1843. Thus, the thrust of the Supreme Court's Title VII cases is to shift the burden of production to defendants-employers on the issue of what would have happened to job applicants had there been no discriminatory employment practices. Our holding, applicable in ADEA actions, creates a similar rebuttable presumption by shifting to employers the burden of production of evidence of an individual's lack of qualifications in cases where victims of proven discrimination seek retroactive relief.[21]

### B.

◼ Having determined that Mr. Rodriguez is entitled to a back pay award, it is necessary to consider a further objection raised by the City to the manner in which the award was calculated. The City contends that the district court erred in not setting off against unpaid wages amounts Mr. Rodriguez earned from other employment. The district court's findings of fact and trial testimony indicate that Mr. Rodri-

---

but not to individual non-employee applicants for OTR positions. The Supreme Court reviewed only the claim by unnamed members of the class of non-employee black applicants for retroactive seniority relief.

**20.** The Court did not distinguish between shifting the burdens of production or persuasion. At the very least, the Court meant to shift the former. For purposes of the instant case, we need not determine which litigant would bear the burden of persuasion on an individual's qualifications in a case where both parties present evidence on the matter. In this case, the City abnegated its burden of coming forward at trial with any evidence of plaintiff's disqualification.

**21.** We need not decide here the proper allocation of evidentiary burdens where similarly situated plaintiffs seek forward-looking equitable relief. Orders for reinstatement or hiring are of on-going consequence to both employee and employer and involve more than making a victim of discrimination whole for past injuries. Back pay, by contrast, squares accounts of what may be a closed relationship. The Supreme Court in *Franks* seems to have recognized such a distinction between prospective affirmative equitable relief and retrospective legal relief. *See* 424 U.S. at 772 n. 31, 96 S.Ct. 1251.

guez worked part-time for his local parish and irregularly as a self-employed private security guard during the interim period for which back pay was calculated (¶ 9, 115a; 54a–56a). Yet the district court did not subtract from its calculation of back pay the income Mr. Rodriguez earned from his part-time jobs.[22]

Reiterating the principle of make-whole relief, a victim of employment discrimination is entitled to be restored to the economic position he would have occupied but for the unlawful discrimination. The only provision in ADEA authorizing more favorable pecuniary relief stipulates liquidated damages be calculated on the basis of the underlying compensatory award in the event of a willful violation. By not setting off Mr. Rodriguez's earnings during the interim period, the district court's order affords him income from two jobs that he could not have simultaneously performed. Thus, the plaintiff was placed in a better economic position than he would have achieved had he not been discriminated against in the first place.

Plaintiff contends that Congress did not contemplate set-offs to ADEA back pay awards. He points to Title VII's back pay provision, which expressly requires that interim earnings be set off against back pay otherwise owing. 42 U.S.C. § 2000e–5(g) (1970). By contrast, the ADEA enforcement provisions do not explicitly mandate such a set-off. It is true that we have stated that the ADEA and Title VII are not to be read as providing wholly consistent enforcement provisions. *Rogers v. Exxon Research & Engineering Co.*, 550 F.2d 834, 840 n. 10 (1977). However, the absence of express set-off language in the ADEA enforcement provisions does not compel the inference that Congress intended to preclude set-offs. The make-whole relief objective is common to both Title VII and ADEA and will be effectuated only if back pay awards are reduced to reflect alternate source earnings.[23]

We hold that rejected job applicants who prevail under ADEA are entitled to back pay in the amounts they would have earned but for the discrimination, less wages actually earned from other employment that could not have been simultaneously performed with the jobs to which they aspired. Defendant-employers must assume the burdens of production and persuasion on the issue of set-offs. Thus, on remand, the district court must consider whether the City proved by a preponderance of the evidence that Mr. Rodriguez's part-time and irregular employment could not have been undertaken had the City hired him as a Security Officer I.

The City also takes exception to the district court's award of liquidated damages on the ground that if no compensatory relief is owing, as they contend, liquidated

---

**22.** The district court made no finding as to the amount Mr. Rodriguez earned during the interim period. Nor did the court express a conclusion of law that a set off to the back pay award was inapposite.

**23.** Courts which have considered the applicability of set offs to ADEA awards have uniformly endorsed a set off of at least income earned from interim period employment. *See EEOC v. Detroit Edison Co.*, 515 F.2d 301, 315 (6th Cir. 1975); *Laugesen v. Anaconda Co.*, 510 F.2d 307, 317–18 (6th Cir. 1975); *Brennan v. Ace Hardware Corp.*, 495 F.2d 368, 373–74 (8th Cir. 1974); *Bishop v. Jelleff Assoc.*, 398 F.Supp. 579 (D.D.C.1974). This circuit has previously approved a district court Title VII award formula which factored in a set off for amounts actually earned. *Ostapowicz v. Johnson Bronze Co.*, 541 F.2d 394, 401 (3d Cir. 1976).

Plaintiff relies on a recent Fifth Circuit decision, *Marshall v. Goodyear Tire & Rubber Co.*, 554 F.2d 730 (5th Cir. 1977), that affirmed a district court ADEA award that did not deduct from back wages unemployment compensation benefits received during the interim period. The appeals court reasoned that unemployment compensation was a collateral benefit akin to collateral losses not compensated for in measuring back pay owing to a plaintiff. To not set off such collateral benefits would not, the *Marshall* court concluded, make the employee more than whole. Without passing judgment on the wisdom of the *Marshall* decision, we note that alternate employment income is surely a direct benefit compared to unemployment compensation. Thus, on the Fifth Circuit's own logic, an employee is made more than whole if he obtains current back pay for two jobs which he could not have simultaneously performed.

damages may not be assessed. Having affirmed the granting of compensatory relief, subject only to the modification as to amount, we leave the award of liquidated damages to the trial judge's discretion, *see, e. g., Hays v. Republic Steel Corp.*, 531 F.2d 1307 (5th Cir. 1976). In light of our holding relating to the mitigation of compensatory damages under the ADEA, the district court should reconsider on remand its award of liquidated damages on the record as it then exists in this case.

### III.

Both parties appeal from the district court's order of October 5, 1976, awarding attorneys' fees to plaintiff's counsel, Community Legal Services, Inc. (CLS). The City contends that CLS, a non-profit, federally-funded, legal services organization is barred by federal law and its own charter from receiving court-awarded attorneys' fees. Plaintiff appeals the calculation of the amount of the award. Specifically, plaintiff contends that the district court's use of a $30.00 per hour rate of compensation based on fee rates in the Criminal Justice Act, 18 U.S.C. § 3006A(d)(1) (1974), constitutes reversible error.[24] We turn to the threshold issue of CLS's eligibility to receive attorneys' fee awards for successfully prosecuting a suit brought under ADEA.

### A.

Community Legal Services, Inc. was chartered under the provisions of Pennsylvania's Non-Profit Corporation Law. According to its charter, CLS may provide legal services to persons financially unable to secure counsel except in matters of a contingent nature or which may yield "a recovery sufficient to interest a private attorney in accepting such a case." Art. IX, Articles of Incorporation of Community Legal Services, Inc., June 23, 1966, *reprinted in* appellants' reply brief at p. 29. CLS receives funds from the federal Legal Serv-

ices Corporation and, therefore, operates subject to the restriction of the Legal Services Corporation Act of 1974, which prohibits recipient legal services organizations from using federal funds in fee generating cases, 42 U.S.C. § 2996f(b)(1) (1974).

The ADEA enforcement provision, 29 U.S.C. § 626(b), incorporates that part of the Fair Labor Standards Act which provides: "The court . . . shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant . . . ." 29 U.S.C. § 216(b) (1970). Given this mandatory language without apparent exception, the district court had to determine whether CLS was implicitly barred by either the Legal Services Corporation Act or other federal law from receiving attorneys' fees awards. In its memorandum opinion the district court found no reason to spare the City an assessment of fees to reimburse CLS (126a). We agree with the district court's conclusion and hold that publicly funded legal services organizations, such as CLS, are not absolutely barred from receiving mandatory ADEA attorneys' fee awards by virtue of the legal limitations on their authority to handle fee generating or contingent fee cases.

The attorneys' fee provisions in the Fair Labor Standards Act have been construed to mandate awards to successful plaintiffs. *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 261 n. 34, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975) (dictum); *Wright v. Carrigg*, 275 F.2d 448, 449 (4th Cir. 1960); *Whittington v. Roberts*, 360 F.Supp. 335, 338 (N.D.Miss.1973). This court has previously stated that "[c]onsequently, attorneys' fees are to be awarded in age discrimination suits in which the employee prevails." *Rogers v. Exxon Research & Engineering Co.*, 550 F.2d 834, 842 (1977). In spite of this unqualified legislative and judicial authority for an award of fees to *all* successful plaintiffs, the City urges this court to judicially except those

---

24. Plaintiff does not challenge the hourly rate allowed Ms. Dicker, but requests modification only in the hourly rate applied to the time expended by Mr. Erba, the senior and lead counsel.

plaintiffs represented by organizations such as CLS which are publicly funded and furnish legal services free of charge to needy citizens.

 As a general matter, awards of attorneys' fees where otherwise authorized are not obviated by the fact that individual plaintiffs are not obligated to compensate their counsel. The presence of an attorney-client relationship suffices to entitle prevailing litigants to receive fee awards. *Torres v. Sachs*, 538 F.2d 10, 13 (2d Cir. 1976); *Brandenburger v. Thompson*, 494 F.2d 885, 889 (9th Cir. 1974); *Miller v. Amusement Enterprises, Inc.*, 426 F.2d 534, 538–39 (5th Cir. 1970). Of course, since the object of fee awards is not to provide a windfall to individual plaintiffs, fee awards must accrue to counsel. *Hairston v. R & R Apartments*, 510 F.2d 1090, 1093 (7th Cir. 1975).

The statutory policies underlying the award of fees justify such shifting without regard to whether the individual plaintiff initially assumed the financial burdens of representation. The traditional, and generally applicable, "American Rule" denies successful litigants the possibility of recovering fees from their opponents. Beyond the applicability of several narrow judicially recognized exceptions to the American Rule, the Supreme Court insists that Congress must affirmatively authorize fee awards. *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). Congress, in fact, has often taken up the cudgel and authorized or mandated fee awards in suits brought under diverse statutes. *See id.* at 260 n. 33, 95 S.Ct. 1612. Typically, congressionally approved awards are designed to encourage private enforcement of individual rights and to deter socially harmful conduct. For example, Congress, in passing the Civil Rights Act of 1964, authorized fee awards for "private attorneys general" who might otherwise be deterred from bringing suit because of the burdensome costs of litigation. *Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 401–02, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968) (per curiam). More recently, Congress responded to the Supreme Court's decision in *Alyeska Pipeline* by closing "gaps" left in other civil rights laws and authorized the award of attorneys' fees in actions brought under several provisions, including 42 U.S.C. §§ 1981, 1982, 1983 and 1985. Civil Rights Attorney's Fees Awards Act of 1976, *amending* 42 U.S.C. § 1988 (1976). *See* Sen.Rep.No.94–1011, 94th Cong., 2d Sess., U.S.Code Cong. & Admin.News 1976, p. 5908. The award of fees to legal aid offices and other groups furnishing *pro bono publico* representation promotes the enforcement of the underlying statutes as much as an award to privately retained counsel. Legal services organizations often must ration their limited financial and manpower resources. Allowing them to recover fees enhances their capabilities to assist in the enforcement of congressionally favored individual rights. *See Hairston v. R & R Apartments*, 510 F.2d 1090, 1092–93 (7th Cir. 1975); *Palmer v. Columbia Gas of Ohio, Inc.*, 375 F.Supp. 634, 636 (N.D.Ohio 1974); *Jones v. Seldon's Furniture Warehouse, Inc.*, 357 F.Supp. 886, 887–88 (E.D.Va.1973); Note, Awards of Attorney's Fees to Legal Aid Offices, 87 Harv. L.Rev. 411, 413–14 (1973). Moreover, assessing fees against defendants in all circumstances may deter wrongdoing in the first place. *See Jones v. Seldon's Furniture Warehouse, Inc., supra.*

The City concedes that the purpose in funding legal services organizations and in authorizing awards of fees are in part identical—removing financial barriers to access to the courts. The City contends, however, that the separate congressional initiatives are mutually exclusive solutions to the problem of enhancing access to the courts. There are no persuasive logical or policy reasons why awards of fees to legal services organizations in particular cases cannot complement the base funding of such groups. Nor have we been referred to any expressions of congressional intent to exclude legal aid offices from receipt of attorneys' fees awards. The City instead presses a construction of the Legal Services Corporation Act's prohibition of the use of federal funds for fee generating cases as cover-

ing all suits brought under statutes authorizing awards of fees to successful plaintiffs.[25]

The Legal Services Corporation Act bars recipient organizations from using federal funds "to provide legal assistance with respect to any fee-generating case (except in accordance with guidelines promulgated by the Corporation) . . . ." 42 U.S.C. § 2996f(b)(1) (1974). The Legal Services Corporation has adopted implementing regulations which do not flatly prohibit legal services organizations from maintaining fee-generating cases in all situations. 45 C.F.R. §§ 1609 et seq. (1976). The regulations qualify the statutory bar by permitting legal services organizations to provide counsel in fee-generating cases as a matter of last resort if no other adequate private representation is available. Id. § 1609.3. The thrust of the enabling regulations is that legal services organizations should not compete with private practitioners but that if no private attorneys were willing to accept a particular fee-generating case, then legal aid offices may furnish counsel. With this policy rationale as a backdrop, the Corporations' guidelines expressly permit recipient organizations to accept court-awarded fees if there are certain assurances that private counsel is unavailable.[26] Id. §§ 1609.4, 1609.5.

The district court found nothing on the record to suggest that CLS failed to follow its routine procedures to determine whether there might have been private counsel available to accept Mr. Rodriguez's suit (126a). Nor is there any suggestion on the record that CLS's internal procedures are deficient in identifying those cases where private attorneys might be available to accept a case on the contingency of a fee award. The City contends that CLS should bear the burden of introducing evidence that this particular case was indeed one in which private representation was unavailable and that, absent such affirmative evidence, a violation of federal regulations must be presumed. If a legal services organization's routine procedures comply with Legal Services Corporation regulations on fee-generating cases, 45 C.F.R. § 1609.4, as CLS's apparently do, we see no reason to establish a presumption that the organization circumvents its own procedures. Thus, as to this particular request for attorney's fees we perceive no basis for disturbing the district court's finding that "[p]rivate attorneys apparently lacked interest." (126a) Given such a finding that CLS's acceptance of Mr. Rodriguez's suit in no way competed with the private bar, CLS may be awarded attorney's fees in accord with the enabling regulation, 45 C.F.R. § 1609.5.[27]

---

25. It should be noted that the City's argument has far broader ramifications than that legal services organizations may not receive fee awards. The statutory provision on which the City relies forbids the use of federal funds in maintaining the suits from the outset. Thus, were we to rule that 42 U.S.C. § 2996f(b)(1) absolutely bars awards of fees to legal aid offices, we would per force restrict legal services from participation in many matters, such as civil rights suits, in which Congress must have contemplated an active role for legal services organizations. See Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 262–63 n. 36, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975) (remarks during congressional debates on passage of the Legal Services Corporation Act of 1974 indicate that legal services organizations would be able to accept fee awards where pursuing the role of private attorneys general).

26. The regulations define fee-generating cases as those which "reasonably may be expected to result in a fee for legal services from an award

to a client, from public funds, or from the opposing party." 45 C.F.R. § 1609.3. It is unnecessary to determine here whether all suits brought under statutes which authorize discretionary fee awards, as distinct from mandatory awards under ADEA, bear a reasonable expectation of a fee award. Moreover, the probability of success on the merits may be so low in some cases, although not frivolously low, as to dispel any reasonable expectation of even a mandatory award.

27. In its supplemental reply brief, the City contends that Article IX of CLS's charter is more restrictive than federal regulations and absolutely bars acceptance of any case that affords a reasonable prospect of a fee award. Article IX does not expressly equate attorneys' fee awards with personal injury cases, which are expressly proscribed by charter. Article IX seems designed to forestall CLS's incursion into the domain of the private bar, thereby complementing the federal regulations with the same purpose. Satisfaction of the latter regu-

### B.

We have consistently deferred to the informed discretion of the district court in calculating an award of attorneys' fees. *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 540 F.2d 102, 115 (3d Cir. 1976) (Lindy II); *Merola v. Atlantic Richfield Co.*, 493 F.2d 292, 295 (3d Cir. 1974) (Merola I); *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161, 166 (3d Cir. 1973) (Lindy I). The exercise of such discretion must, however, conform to proper standards and procedures. The failure of a trial court to adhere to generally applicable rules and criteria may constitute a "misuse" of discretion unentitled to the appellate court deference generally accorded factually oriented calculations by a trial judge. *Lindy II, supra* at 116; *Merola I, supra* at 295. On this appeal we are confronted with plaintiff's argument that the district court misused its discretion by relying on impermissible criteria in formulating its award of fees.

The leading case governing calculation of attorneys' fees awards in this circuit is *Lindy I*. There Chief Judge Seitz prescribed generally applicable standards to guide district courts in measuring reasonable attorneys' fees. The focal point of the *Lindy I* standards is the purpose of fee awards—compensation of attorneys for the reasonable value of services benefiting the plaintiffs. *Lindy I* at 167. The "lodestar" for an objective calculation of the reasonable value of attorneys' services involves determining the number of compensable hours and multiplying those hours by a reasonable hourly rate. *Id.* at 167–68. The resulting product constitutes an expected market value of attorneys' services. *Merola I, supra* at 298. The objective market value figure

is then adjusted to reflect more subjective factors indicative of the value of the delivered performance such as the quality of work, the contingency of success and the benefit conferred. *Merola v. Atlantic Richfield Co.*, 515 F.2d 165, 173 (3d Cir. 1975) (Merola II); *Merola I, supra* at 298; *Lindy I, supra* at 168–69.

The instant appeal concerns the criteria employed by the district court in fixing a reasonable hourly rate for legal services organization attorneys. In *Lindy I* we noted that "[t]he value of an attorney's time *generally* is reflected in his normal billing rate." *Lindy I, supra* at 167 (emphasis added). An obvious difficulty arises when the attorneys entitled to fees do not have a normal billing rate and, instead, are salaried employees of a publicly-funded legal services organization. Lacking a precise referent for deriving a reasonable hourly rate for CLS employees, the district court seized upon three factors—the attorneys' experience, their annual salaries, and compensation for lawyers appointed under the Criminal Justice Act, 18 U.S.C. § 3006A (1970). We are called upon to determine whether reliance on any of these factors in estimating a reasonable hourly rate may constitute a misuse of discretion in calculating an amount of a fees award.[28]

The absolute levels of billing rates for attorneys in a private firm depend in large measure on the financial stakes clients have in particular matters. While partnership shares and associates' salaries may vary on the basis of relative experience and responsibility, the structure of a firm's billing rates is generally a function of the type of work performed and the affluence of its clients. Whether the practitioners be top flight antitrust or securities litigators or contingent fee tort lawyers, billing rates reflect their clients' monetary stakes,

---

lations should imply satisfaction of the similarly conceived, but more vaguely worded, charter restrictions.

**28.** After settling on an hourly rate for the CLS attorneys' services, the district court considered the other *Lindy I* factors, which focus on the delivered performance value of their services—contingent nature of success (130a–

31a) and quality of work (131a–32a). *Merola I, supra* at 298. The district court concluded that these other factors balanced out necessitating no adjustment of his lodestar calculation of the value of the attorneys' time expended in litigation. Neither party has taken an appeal contesting the district court's findings as to the balancing out of the various plus factors.

whether in the form of potential cash awards or liabilities. Whenever private counsel petition for reasonable fee awards, they will point to their market billing rates which are determined in large part by the financial stakes in contested matters.[29]

Legal services attorneys and other public interest lawyers do not have normal billing rates because they have no "market" for their skills. These attorneys typically do not bill their clients at all. As a result, the reasonable value of these attorneys' time cannot be simply measured by observing their market rates. Moreover, legal services attorneys' work cannot be valued by comparing the pecuniary benefits conferred on their clients to the larger financial stakes in matters handled by the private bar.

■ As we have observed above, CLS cannot generally represent clients, however impecunious, if substantial monetary benefits might be won. Thus, legal services organizations may win only modest cash awards or nonmonetized equitable relief for their clients. Despite the often insignificant potential monetary benefits in individual cases, legal services organizations render valuable services to their clients and their communities. Legal aid organizations often are the sole representatives of the economically, socially and culturally deprived in their disputes with landlords, government welfare agencies, employers and creditors. The cumulative value to society, and hence the derivative value of individual attorney's time, from legal services representation of the needy is substantial, albeit not easily monetized. The only fair conclusion that can be reached is that, with the present structure for the delivery of legal services, relative compensation of private firm attorneys and legal aid lawyers

does not entirely reflect differences in the reasonable value of their respective professional time. Courts, in awarding attorneys' fees, are not empowered to rectify this general disparity. However, they may properly take account of these market disparities in fixing reasonable hourly rates for particular awards. We believe that excessive consideration to either legal aid salaries or to Criminal Justice Act (CJA) fee scales deflects calculation of a reasonable hourly rate of compensation for legal services attorneys.

■ Legal services salaries are generally considerably lower than salaries paid associates in private firms who have comparable experience and credentials. This salary differential need bear no relation to the quality of representation, in general or in a particular case, or to the benefits received by clients. Compensation disparities usually reflect the relative poverty of legal services funding. While a CLS attorney's salary need not be ignored by the trial court, neither should it serve as the polestar for fixing a reasonable hourly rate of compensation. Relative salaries within the legal services unit reflect relative expertise and responsibility and, therefore, provide an objective guide to setting *relative* hourly rates.[30] Reference to absolute salary levels is about as reasonable as deriving the reasonable value of a federal judge's time from his or her salary.[31] Thus, we hold that the district court misused its discretion by emphasizing the factor of absolute salaries paid by CLS in deriving an hourly rate of compensation. To the extent salary levels are relevant, the appropriate referent would be comparable salaries earned by private attorneys with similar experience and expertise in equivalent litigation.

---

**29.** Admittedly, when private firms handle *pro bono publico* litigation, they often request reduced hourly rates of compensation so as not to make a profit. *See, e. g. Commonwealth of Pennsylvania v. O'Neill*, 431 F.Supp. 700, 707 (E.D.Pa.1977). Nevertheless, the referent for determining a break even hourly rate remains their prevailing market rates for their regular clients.

**30.** In fact, the district court approved a $30.00 per hour rate for both CLS attorneys, even though the senior of the two earned $4,000. more in salary, a differential of over 30%.

**31.** The problems with figures generated by deduction of judges' hourly rates are amply illustrated in the district court's opinion (130a, n. 2).

The district court, in addition to factoring in CLS salaries, used as a benchmark congressionally specified fees for court-appointed attorneys who represent indigent criminal defendants. Under the Criminal Justice Act, court-appointed counsel, whether they be from the private bar or a public defender organization, are entitled to the limited amounts of $30.00 per hour for in-court representation and $20.00 per hour for out-of-court preparation, subject as well to maximum limits on the total fee. 18 U.S.C. § 3006A(d) (1970). Compensation is awarded regardless of the outcome of the criminal proceeding. At issue here is whether a district court misuses its discretion by applying CJA rates as a primary basis for calculating a reasonable hourly rate for legal services representation in age discrimination suits.

 The Criminal Justice Act fee rates apply by force of statute only to court-appointed counsel for indigent criminal defendants. Congress has not explicitly incorporated these fee rates in the ADEA. Instead, Congress incorporated the more flexible standard from the Fair Labor Standards Act, which provides for a judicially calculated award of "a reasonable attorney's fee." 29 U.S.C. § 216(b) (1974). The district court judge in this case deemed the non-incorporated CJA fee rates a suitable guide for determining a reasonable hourly rate. We believe that CJA fees rates are a product of several factors unique to the criminal defense context which militate against their application in employment discrimination suits.

The Federal Government is obligated, as a matter of constitutional law, to furnish counsel for indigent criminal defendants. *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). No such obligation extends to civil litigants. Thus, compensation must be accorded court-appointed counsel under the CJA regardless of the outcome of the proceedings. In ADEA suits, only a successful plaintiff may recover fees. In the criminal context, the Federal Government must assume the entire burden of paying court-awarded fees, even where the prosecution prevails in obtaining convictions. In employment discrimination suits, defendants who pay fee awards must have been found liable for unlawful practices. Significantly, the ADEA applies to private and public employers.[32] Moreover, members of the bar may have a greater duty to their profession to accept criminal defense representation than civil plaintiffs at less than customary compensation.[33] Thus, the modest fee allowances in the CJA reflect in large measure these unique features of the criminal defense system.

In civil rights litigation, closely analogous to ADEA, Congress has directed judges, in calculating attorneys' fee awards, to consider factors other than adoption of CJA fee schedules. The Civil Rights Attorney's Fees Awards Act of 1976 (Fees Act), amending 42 U.S.C. § 1988, applicable to suits brought under 42 U.S.C. § 1983 and companion civil rights provisions, authorizes discretionary awards to prevailing parties of "reasonable" attorneys' fees. The legislative history of the Fees Act makes clear that Congress intended the referent for reasonable fees to be awards in comparable litigation. The Senate Report accompanying the bill enacted into law expresses the congressional directive as follows:

> "It is intended that the amount of fees awarded under S. 2278 be governed by the same standards which prevail in other types of equally complex Federal litigation, such as antitrust cases and not be reduced because the rights involved may be non-pecuniary in nature."

---

**32.** The fact that the City of Philadelphia's tax revenues must pay the fees award does not warrant special standards for public and private employers. The reasonable value of an attorney's time does not depend on who his or her adversary is. *See Torres v. Sachs*, 538 F.2d 10, 12–13 & n. 2 (2d Cir. 1976).

**33.** The legislative committee reports accompanying the CJA reveal that Congress intended the fee awards to "offer some but not full compensation for the appointed attorney." House Report No. 91–1546, 91st Cong., 2d Sess., reprinted in [1970] U.S.Code Cong. & Ad.News 3982, 3984 (adopting identical language of Senate Report No. 91–790).

Senate Report No. 94–1011, 94th Cong., 2d Sess. 6, reprinted in [1976] U.S.Code Cong. & Admin.News, p. 5913.

■ The First Circuit Court of Appeals has recently considered the appropriateness of reliance on CJA fee rates in calculating awards granted under the newly enacted Fees Act. After considering the legislative history cited above, the court concluded that, "[m]echanical application of the Criminal Justice Act fees scale obviously does not meet these criteria . . . ." *King v. Greenblatt*, 560 F.2d 1024 at 1026 (1st Cir. 1977), *overruling Souza v. Travisono*, 512 F.2d 1137 (1st Cir.), *vacated*, 423 U.S. 809, 96 S.Ct. 19, 46 L.Ed.2d 29 (1975). *See also Torres v. Sachs*, 538 F.2d 10, 12–13 & n. 2 (2d Cir. 1976) (fees in actions under the Voting Rights Act of 1964 are to be measured by same standards as in other complex litigation); *Palmer v. Rogers*, 10 E.P.D. ¶ 10,499 at p. 6131 (D.D.C.1975) (rejecting application of CJA fee scales in the calculation of awards under Title VII). We agree with the First Circuit and rule that in the analogous context of ADEA suits, district court judges should look to cases of similar complexity, in particular other employment discrimination and related civil rights suits, to determine reasonable hourly rates for counsel who do not have normal private practice billing rates.

■ We do not hold that awards figured on the basis of a $30.00 per hour rate of compensation are unreasonable or that they are out of line with rates used in calculating awards in comparably complex litigation. Nor do we pass judgment on the reasonableness of the requested $50.00 per hour rate for the senior CLS attorney. We hold only that the district court judge misused his discretion in fixing hourly rates of compensation on the basis of CLS's absolute salary levels and the CJA fee scale. On remand, the district court should undertake appropriate fact finding to apply the criteria discussed in this opinion for determining a reasonable hourly rate of compensation

**34.** We note that counsel for the plaintiff have appended to their brief a deposition attesting to the number of hours devoted to this appeal.

for CLS attorneys.[34] *See Richerson v. Jones*, 551 F.2d 918, 928–29 (3d Cir. 1977); *Merola II, supra* at 168–69.

### IV.

For the foregoing reasons, paragraph 5 of the district court's order of September 2, 1976, and the district court's order of October 5, 1976, will be vacated and the case will be remanded for further action in accordance with this opinion, including determination of these issues: the recalculation of plaintiff's monetary award to account for necessary set-offs, and the recalculation of the attorneys' fee award to reflect the reasonable value of the CLS attorney's time devoted to this litigation.

Claims for an award for these hours should be addressed to the district court on remand.