Mary GLOVER, et al., Plaintiffs,

v.

Perry JOHNSON, Director, Michigan Department of Corrections, et al., Defendants.

Civ. A. No. 77–71229.

United States District Court, E. D. Michigan, S. D.

Feb. 3, 1982.

See also, D.C., 478 F.Supp. 1075, and D.C., 510 F.Supp. 1019.

---

Mark E. Weiss, Detroit, Mich., for plaintiffs.

Keith Roberts, Asst. Atty. Gen., Lansing, Mich., for defendants.

## OPINION GRANTING AWARD OF ATTORNEY FEES

FEIKENS, Chief Judge.

The attorneys for plaintiffs have petitioned the court for an award of fees in the amount of $108,315.00 and of costs in the amount of $2,227.19 pursuant to 42 U.S.C. § 1988, the Civil Rights Attorney's Fees Awards Act of 1976. This Act states, in part, that:

> In any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title . . . the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

### Background

Mary Glover is one of a group of named plaintiffs who represented a class of approximately 400 women prisoners in this action. In a case of first impression, the women challenged the policies and procedures practiced by the Michigan Department of Corrections as constituting discriminatory treatment against women who were incarcerated under state law. The case was unable to be resolved before trial, although lengthy settlement negotiations took place, and ten days were necessary in which to take testimony. In an opinion issued October 17, 1979, I found that the rehabilitation opportunities available to the State's women prisoners were substantially inferior to those available to the State's male prisoners; that implementation of a legal studies course was necessary to guarantee the women inmates' right of access to the courts; and that the use of Kalamazoo County Jail for housing female prisoners was proscribed by state statute and regulation. 478 F.Supp. 1075. On October 26, 1979, I entered an order setting forth in general terms the remedies that the State would be required to implement and requiring it to submit for court approval its remedial plan. The plan itself resulted in lengthy negotiations and I entered a final order on April 6, 1981, incorporating the provisions of various interim orders, and

providing, in part, for an associate degree program, apprenticeships, prison industries, paralegal training programs, and off-grounds privileges, that would put the women prisoners on parity with the men. 510 F.Supp. 1019.

*Determination*

██ An award of attorney's fees is proper in this case since plaintiffs prevailed. Congress intended that plaintiffs with meritorious claims which "further an important public interest but do not result in an award of damages from which attorney's fees can be paid, are not discouraged from bringing suit because of the prospect of having to pay their own attorney's fees." *Martin v. Hancock*, 466 F.Supp. 454 (D.Minn.1979).

Defendants argue that plaintiffs did not prevail on all claims put before me in this complex litigation. They particularly object to any award of attorney fees for a restraining order sought against them for harassing plaintiffs in June of 1980. Plaintiffs brought the petition for a restraining order due to a series of actions taken by the Department of Corrections that could have been construed as harassment or retaliation for the results that plaintiffs achieved through my opinion of October 17, 1979. In effect, Corrections personnel allegedly seized upon an extremely literal meaning of the phrase "equal protection" and used it so as to deny women prisoners privileges that they had theretofore enjoyed, such as possession of small personal items, including jewelry and personal clothing. Plaintiffs additionally alleged violations of my interim order which required the transfer of inmates to Camp Pontiac (now Camp Gilman) on a voluntary, not selective basis.

Defendants argue that the restraining order constituted a prior restraint on speech in violation of the First Amendment and that since plaintiffs were never granted a preliminary injunction, although a temporary restraining order was issued, they never prevailed on the issue. However, I believe that the issues raised by the petition were, and are, of continuing concern to me, although I found it unnecessary to formally resolve them at that juncture. I do not agree that the failure to issue a formal opinion or order a preliminary or permanent injunction bars the award of attorney fees, for to do so would honor form and ignore the substance of plaintiffs' complaints.

Furthermore, attorney fees are explicitly permitted in these instances. The blueprint for the award is contained in *Northcross v. Board of Education of the Memphis City Schools*, 611 F.2d 624 (6th Cir. 1979), *cert. denied*, 447 U.S. 911, 100 S.Ct. 2999, 64 L.Ed.2d 862 (1980). The court stated the rule as follows:

> The question as to whether the plaintiffs have prevailed is a preliminary determination, necessary before the statute comes into play at all. Once that issue is determined in the plaintiffs' favor, they are entitled to recover attorneys' fees for "all time reasonably spent on a matter." The fact that some of that time was spent in pursuing issues on research which was ultimately unproductive, rejected by the court, or mooted by intervening events is wholly irrelevant. So long as the party has prevailed on the case as a whole the district courts are to allow compensation for hours expended on unsuccessful research or litigation, unless the positions asserted are frivolous or in bad faith.

*Northcross, supra*, 611 F.2d at 636. Since I find that plaintiffs have prevailed in the lawsuit as a whole and since I do not find that any of the issues raised and brought before this court were frivolous or in bad faith so as to accrue larger attorney fees, I will fully allow claims to be made on all issues in the suit.

*Method of Calculation of Attorney Fees*

██ The Civil Rights Attorney's Fees Awards Act serves two purposes. First, the opportunity to obtain competent counsel is provided to those citizens who must sue to enforce their rights, especially where the individual may not normally be able to afford a lawyer. Second, the indirect effect is as a deterrent because fee awards will

encourage an individual to vindicate his civil rights in court, providing the added deterrent to the defendant by imposing a monetary burden, even where no damages are awarded. *See, Oldham v. Ehrlich*, 617 F.2d 163, 168 (8th Cir. 1980). Therefore, it is apparent that fee awards were not meant to be rewards to victorious attorneys but, taking into consideration the practicality of the work of lawyering, a way to encourage attorneys to accept civil rights cases.

The United States Court of Appeals for the Sixth Circuit has interpreted the Act through *Northcross, supra*. The rule in that case is applied by reviewing the petition for attorney fees, subtracting the hours that are duplicative or used for padding, and awarding a "reasonable" attorney fee for the balance of the hours claimed by counsel for the prevailing party.

> Particularly important to this case is the instruction that counsel for the prevailing party should be paid, "as is traditional with attorneys compensated by a fee-paying client, for all time reasonably expended on a matter." The goal to be achieved, according to the Senate Report [Senate Report No. 94–1011, reprinted in 1976 U.S.Code Cong. & Admin.News p. 5908], is to make an award of fees which is "adequate to attract competent counsel, but which do not produce windfalls to attorneys."

*Northcross, supra*, 611 F.2d at 633.

■ In this case, I am confronted by a situation that is becoming increasingly common. Plaintiffs were represented by Judith Magid, who was employed by Wayne County Neighborhood Legal Services, and Charlene Snow, an attorney at Michigan Legal Services.[1] In instances where public interest law groups and their attorneys are involved, a simple application of *Northcross* overlooks the particular problems of applying a flat "reasonable" hourly fee that is calculated by reference to community attorneys and their "fair market value." Public interest law groups generally provide a salary for their attorneys which is almost invariably lower than competitive salaries in the communities. The groups are funded by governmental grants and private donations which additionally pay for the support personnel salaries, office rent, supplies, and provide limited litigation funds to pay expert witnesses, filing fees, and other costs of lawsuits (all of which shall hereinafter be referred to as "overhead"). Application of what may be considered a reasonable attorney fee in the community may either be insufficient to compensate the group for its overall costs or, albeit unlikely, constitute a "windfall." Thus, the precepts of *Northcross*, combined with the legislative history of the Civil Rights Attorney's Fees Act, have encouraged my fashioning of a model for the award of attorney fees to public interest law groups. Indeed, *Northcross* may be read so as to encourage such an approach.

> This does not mean that the routine hourly rate charged by attorneys is the maximum which can or should be awarded. In many cases that rate is not "reasonable," because it does not take into account special circumstances, such as unusual time constrain [sic], or an unusually unpopular cause, which affect the market value of the services rendered. Perhaps the most significant factor in these cases which at times renders the routine hourly fee unreasonably low is the fact that the award is contingent upon success. An attorney's regular hourly billing is based upon an expectation of payment, win, lose or draw. If he or she will only be paid in the event of victory, those rates will be adjusted upward to compensate for the risk the attorney is accepting of not being paid at all. Some cases under the civil rights statutes, those in which the facts are strong and the law clear, pose little risk of losing, and the attorney's normal billing rate will be adequate compensation. Others, in developing areas of law or where the facts are strongly

---

1. Ms. Snow has since left Michigan Legal Services but has continued as counsel as a part of her private practice. I have no difficulty in applying the usual test of *Northcross* to those hours that she claims individually.

disputed, will require a substantial upward adjustment to compensate for the risk.

611 F.2d at 638.

Northcross suggests that a court should "look to the fair market value of the services provided" to calculate a reasonable hourly fee even for those attorneys "who have no private practice." 611 F.2d at 638. However, it has been suggested that legal services attorneys, and by analogy, other public interest lawyers, do not have a normal billing rate since there is no "market" for their skills. See, Rodriguez v. Taylor, 569 F.2d 1231 (3d Cir. 1977), cert. denied, 436 U.S. 913, 98 S.Ct. 2254, 56 L.Ed.2d 414 (1978). In most instances, legal services clients do not pay for the attorney's services. Sometimes a sliding scale arrangement is adopted which bills a client according to his ability to pay, but the fee generally never approaches the cost of providing the services. However, the ever present clientele who use the services could never pretend to be a "market" for the public interest attorney's services.

> The cumulative value to society, and hence the derivative value of individual attorney's time from legal services representation of the needy is substantial, albeit not easily monetized. The only fair conclusion that can be reached is that, with the present structure for the delivery of legal services, relative compensation of private firm attorneys and legal aid lawyers does not entirely reflect differences in the reasonable value of their respective professional time. Courts, in awarding attorneys' fees, are not empowered to rectify this general disparity. However, they may properly take account of these market disparities in fixing hourly rates for particular awards.

Rodriguez, supra, 569 F.2d at 1248. Hence, the mere definition of market value precludes a ready determination of reasonable fee for public interest lawyers.

The courts have not agreed to a method of calculation for a reasonable fee to be awarded to public interest law groups although it is well settled that fees are awardable to the groups. See, Incarcerated Men of Allen County Jail v. Fair, 507 F.2d 281, 286 (6th Cir. 1974), where the court stated that, "[t]he fact that Appellees' counsel was a legal services organization, partially supported by public funds, is irrelevant in determining whether an award is proper," and cases cited therein. See also, Brandenburger v. Thompson, 494 F.2d 885 (9th Cir. 1974), and Loney v. Scurr, 494 F.Supp. 928 (S.D.Iowa 1980), where the court rejected a unique argument by defendant that since plaintiff's attorney fees had already been paid by the state in the form of grants ultimately derived from public money, it is unjust to require the defendant to pay for the same services through an award of attorney fees. Several courts have commented that it is unfair to calculate a reasonable hourly fee on the basis of salary alone. Judge Van Dusen, in Rodriguez, commented that:

> Legal services salaries are generally considerably lower than salaries paid associates in private firms who have comparable experience and credentials. This salary differential need bear no relation to quality of representation, in general or in a particular case, or to the benefits received by clients. Compensation disparities usually reflect the relative poverty of legal services funding . . . Reference to absolute salary levels is about as reasonable as deriving the reasonable value of a federal judge's time from his or her salary. . . . To the extent salary levels are relevant, the appropriate referrent would be comparable salaries earned by private attorneys with similar experience and expertise in equivalent litigation.

Rodriguez, supra, 569 F.2d at 1248. See also, Palmigiano v. Garrahy, 616 F.2d 598, 602 (1st Cir. 1980), cert. denied, 449 U.S. 839, 101 S.Ct. 115, 66 L.Ed.2d 45 (1980); Lackey v. Bowling, 476 F.Supp. 1111, 1116–17 (N.D.Ill.1979); Gunther v. Iowa State Men's Reformatory, 466 F.Supp. 367, 368–69 (N.D.Iowa 1979); Beazer v. New York City Transit Authority, 558 F.2d 97, 100 (2d Cir. 1977), rev'd on other grounds, 440 U.S. 568, 99 S.Ct. 1355, 59 L.Ed.2d 587 (1979). One reason for the decisions appears to be that a

market value fee for a private attorney includes several different factors in its calculation, including cost, overhead, and profit, in addition to the fee, that are necessary to provide representation to a client. *See, Gunther, supra,* 466 F.Supp. at 369. A list of considerations exists to assist a court in the determination of what constitutes "appropriate standards" for the determination of a reasonable fee, *Johnson v. Georgia Highway Express,* 488 F.2d 714 (5th Cir. 1974),[2] but they were formulated with a private practitioner in mind and bear little relationship to public interest lawyers because of the differences between the two groups. Thus, this line of reasoning can be expressed as an "apples and oranges" approach. In lieu of an award of proportionate salary, some courts have concluded that a reasonable attorney fee in the community is an appropriate award to legal services groups. *Palmigiano, supra,* 616 F.2d at 601; *Reynolds v. Coomey,* 567 F.2d 1166 (1st Cir. 1978); *Dietrich v. Miller,* 494 F.Supp. 42, 44 (N.D.Ill.1980); *Donaldson v. O'Connor,* 454 F.Supp. 311, 313–14 (N.D.Fla.1978); *Davis v. County of Los Angeles,* 8 E.P.D. ¶ 9444 (C.D.Cal.1974).

It has been suggested in several circuits that there is no reason to distinguish a reasonable fee for a private attorney from a reasonable fee for a public interest attorney. *Copeland v. Marshall,* 641 F.2d 880, 889 (D.C.Cir.1980); *Palmigiano, supra,* 616 F.2d at 601–03; *Rodriguez, supra,* 569 F.2d at 1247–48; *Lackey, supra,* 476 F.Supp. at 1116–17; and *Gunther, supra,* 466 F.Supp. at 369. The reasoning in this line of cases begins with Senate Report No. 94–1011, *supra,* which states, in pertinent part:

> The appropriate standards, see *Johnson v. Georgia Highway Express,* 488 F.2d 714 (5th Cir. 1974), are correctly applied in such cases as *Stanford Daily v. Zurcher,* 64 F.R.D. 680 (N.D.Cal.1974); *Davis v. County of Los Angeles,* 8 E.P.D. ¶ 9444

(C.D.Cal.1974); and *Swann v. Charlotte-Mecklenburg Board of Education,* 66 F.R.D. 483 (W.D.N.C.1975). These cases have resulted in fees which are adequate to attract competent counsel, but which do not produce windfalls to attorneys. In computing the fee, counsel for the prevailing parties should be paid, as is traditional with attorneys compensated by a fee-paying client, "for all time reasonably expended on a matter." *Davis, supra; Stanford Daily, supra,* at 684.

1976 U.S.Code Cong. & Admin.News 5908, at 5913. Thereafter, each court rationalizes its failure to set an independent hourly fee for public interest attorneys differently.

The court in *Copeland v. Marshall,* the most recent decision and, *de facto,* the one with the benefit of previous decisions, articulates four reasons for awarding a community rate to public interest lawyers. First, it relies on the legislative history, stating that no distinction was drawn between the private and public interest bar in the Senate Report and citing to *Davis, supra,* 8 E.P.D. at 5048–49, where awards to public interest law firms were computed in the "traditional manner." Second, it alleges that the purpose of the Civil Rights Attorney's Fees Act will be advanced by the "market value" approach. It speculates that fee awards paid by discriminators may, in fact, aid in reducing the subsidies paid from the public funds to the organization. Third, the court is concerned that the defendant may profit by a windfall since it would be under less pressure to settle and that the deterrent purpose would be proportionately decreased. Finally, the court relies on precedent set by other judges who considered the question. It cites from the United States Supreme Court's decision in *New York Gaslight Club, Inc. v. Carey,* 447 U.S. 54, 100 S.Ct. 2024, 64 L.Ed.2d 723 (1980), which agreed that Congress approved of the award of attorney fees to

---

**2.** These factors include the following: (1) time and labor required; (2) novelty and difficulty of the question; (3) skill required to perform the service; (4) preclusion of other employment; (5) customary fee; (6) fee agreement; (7) time limitations; (8) amount involved and results obtained; (9) experience, reputation and ability of attorney; (10) "undesirability" of case; (11) nature and length of professional relationship with client; and (12) awards in similar cases. *Johnson, supra,* 488 F.2d at 717–19.

public interest groups in the Civil Rights Attorney's Fees Awards Act. The court grasps at the citations in the Supreme Court's decision to *Reynolds v. Coomey, supra*, and *Torres v. Sachs*, 538 F.2d 10 (2d Cir. 1976), to imply a tacit approval of its reasoning, quoting the following passage from *Torres*:

> *allowable fees and expenses may not be reduced because [the prevailing party's] attorney was employed ... by a civil rights organization or because the attorney does not exact a fee.*

(Emphasis added in *Copeland*). 538 F.2d at 13. I do not disagree with the proposition that a prevailing party's attorney fees should not be reduced merely because counsel is employed by a public interest law firm but I contend that it should be calculated differently to account for the differences between public interest attorneys and private lawyers.

The panel in *Palmigiano, supra*, argues in the same vein as *Copeland*, citing the passage from *Davis* but noting that the court in *Davis* made its own assessment of reasonable hourly rates by referring to the *Johnson* criteria. *See*, footnote 2, *supra*. The court also approved an award of "market value" fees because it would enable more civil rights litigation to be funded through an organization with finite resources, thus furthering the legislative purpose and noted that it would not consider such enrichment to constitute a windfall. This reasoning was also applied in *Lackey, supra*.

In *Rodriguez, supra*, the panel recognized the difficulty of applying a normal billing rate to attorneys salaried by publicly funded legal services organizations. It noted that private firms often calculate into their billing rates the financial stake of the firm in the contested matter, a concern not reflected by the public interest law firms who, admittedly, have no "market." However, the court ultimately decided that to the extent salaries are relevant to consideration in the calculation of a fee, they should be compared to salaries of attorneys in the private sector with similar experience and

expertise, a conclusion based on rhetoric not reasoning. On remand, the district court was requested to recalculate the fee award to reflect the value of the attorney's time with guidance that consisted principally of rejection of the previously used methods of the court—annual salary and compensation for lawyers appointed under the Criminal Justice Act, 18 U.S.C. § 3006A (1970).

The concern that defendants would profit from the calculation of different hourly fees for public interest and private attorneys was echoed by the court in *Gunther, supra*. In rejecting the *Page-Alsager* approach of its neighboring district, one based on a proportionate amount of the attorney's salary (see my discussion *infra*, at 1043), the court declared that the award under the method would be a "travesty and substantially harm future plaintiffs represented by public interest counsel in their attempts to induce settlement." 466 F.Supp. at 368–69. However, the case intimates that a more complex method of arriving at an attorney fee for a public interest group is needed, since

> compensating an organization according to its employee's salary does not take into consideration: (1) the criterion established in *Johnson, supra*, (2) the employer's overhead costs; and (3) salaries for other support personnel.

466 F.Supp. at 369.

I think that the "apples and oranges" approach is as simplistic as the title suggests. The Legal Services Corporations Act, 42 U.S.C. § 2996 *et seq.*, provides that:

> No funds made available by the Corporation under this subchapter, either by grant or contract, may be used—
>
> (1) to provide legal assistance (except in accordance with guidelines promulgated by the Corporation) with respect to any fee-generating case (which guidelines shall not preclude the provision of legal assistance in cases in which a client seeks only statutory benefits and appropriate private representation is not available).

42 U.S.C. § 2996f(b)(1). The guidelines promulgated by Legal Services Corporation do not wholly prohibit fee-generating cases,

but do so only where other adequate representation is available. 45 C.F.R. § 1609.3. Fees may be accepted if other representation is unavailable and a court or administrative body approves the award. 45 C.F.R. § 1609.5. The goal of the guidelines is to restrain the legal services groups from competition with private attorneys while still providing counsel where no private practitioners would accept the case. *See also, Rodriguez, supra*, 569 F.2d at 1246. However, the purposes of the Legal Services Corporations Act would be circumvented if a flat reasonable fee were awarded under the Civil Rights Attorney's Fees Awards Act since the fees in the community generally have profit incorporated in the fixed amount. That profit is not properly awarded to legal services groups is supported, in part, by an analogy to 45 C.F.R. § 1609.6:

> When a case or matter subject to this part results in a recovery of damages, other than statutory benefits, *a recipient may accept reimbursement* from the client for *out-of-pocket costs and expenses* incurred in connection with the case or matter.

The remedy to this situation can take one of two directions. First, one can begin with a determination of a reasonable hourly fee in the community, guess the built-in profit margin, and subtract the amount of profit from the hourly fee. The second, and I believe better, alternative is to begin with the time spent by the attorney and calculate the proportionate amount of cost to the public interest law group of providing her services for the litigation. This prospective approach has the benefit of avoiding any guess work about a profit margin with the additional benefit of compensating the organizations fully for their costs, especially since they may exceed the reasonable hourly fee for junior associates in a large law firm.

I am only aware of two cases that have tacitly approved of this approach, both written by Judge Hanson, although neither

case fully adopts it. In *Alsager v. District Court of Polk County, Iowa (Juvenile Division)*, 447 F.Supp. 572 (S.D.Iowa 1977), the judge awarded attorney fees to three American Civil Liberties Union ("ACLU") lawyers based on the proportion of time that they spent on the litigation and their salaries. His reasoning was:

> The ACLU has been compensated in full for the money expended on attorneys in this case, and, having money that would not otherwise be reimbursed, it can now bring other such similar actions.

447 F.Supp. at 578, *citing to Rodriguez v. Taylor*, 428 F.Supp. 1118 (E.D.Pa.1976), *vacated in part*, 569 F.2d 1231 (3d Cir. 1977), *cert. denied*, 436 U.S. 913, 98 S.Ct. 2254, 56 L.Ed.2d 414 (1978). Judge Hanson had an opportunity to expound upon his method in *Page v. Preisser*, 468 F.Supp. 399 (S.D.Iowa 1979), where plaintiffs were represented by a recipient of funds from the Legal Services Corporation.[3] Therein he explained:

> *Alsager* simply stated means no more than that where an organization successfully undertakes the expense of representing a civil rights plaintiff through its salaried attorneys and no part of the fee award will compensate the attorneys involved, but instead will reimburse the organization in question, "the fact that an attorney is salaried [affects] the method in determining the amount of fees to be awarded."

468 F.Supp. at 401, *citing to Alsager, supra*, 447 F.Supp. at 577.

I agree with Judge Hanson's theory although I believe that simply basing an award on the proportionate amount of an attorney's salary, as in *Alsager*, is too restrictive. The organization incurs expenses incidental to each attorney's salary in order to enable them to work. In fact, Hanson notes that:

> Nothing in *Alsager* precludes including reasonably ascertainable overhead ex-

---

**3.** There is some question as to the precedential value of this decision in the Southern District of Iowa. In *Loney v. Scurr, supra*, 494 F.Supp. at 931 n.7, Judge Hanson himself noted that the

*Page-Alsager* approach was undermined by the *Oldham* case, *supra*, at least where legal services organizations (as opposed to public interest groups) are concerned.

penses attributable to the particular litigation, including the costs of support personnel, in an award to be paid to a public interest organization.

468 F.Supp. at 402. Since it is virtually impossible, or at least time consuming, to apportion to each attorney the precise proportion of support staff and services that were used by the attorney, I have devised the following formula that will derive the desired figure for each year and permit the calculation of a reasonable fee to reimburse public interest law groups:

$$\frac{\text{overhead costs [4]} \div \text{total attorneys}}{\text{total annual billable hours}} + \frac{\text{attorney's salary}}{\text{total billable hours}} = \text{hourly fee [5]}$$

An alternative way to arrive at the same result per annum would be:

$$\frac{\frac{\text{hours on case}}{\text{total hours}} \times \text{salary} + \frac{\text{hours on case}}{\text{total hours}} \times \frac{\text{overhead}}{\text{total attorneys}}}{\text{hours on case}} = \text{hourly fee [6]}$$

Although the concerns articulated by the courts which adopted the "market value" fee for public interest attorneys are valid, I believe that the calculations I propose do not provide a windfall, while complying with the purpose and intent of the Attorney's Fees Act. Additionally, this approach is consistent with the Legal Services Corporations Act and should cause less question about the propriety of fee awards to those organizations. Finally, I believe that in many instances, particularly where a governmental entity is the offender, the difference, if any, between the "market value" fee and the "compensation" fee would be better spent in remedying the disparate treatment or eliminating the discriminatory action. This is not to denigrate the worth or usefulness of the public interest lawyers nor should this be misinterpreted as awarding "incentive" money to private attorneys and not to public interest law groups. Instead, it merely recognizes the reality that a private law firm will not accept civil rights cases with any regularity unless it can be compensated in some manner for the profits

it would otherwise earn. Public interest law groups are non-profit organizations and, to restore them to their original financial position, they need not be awarded the profit margin. For these reasons, I have adopted the method of calculation in the award of attorney fees in this case, rendering the award of the amounts listed in Appendix A.

In calculating the attorney fees under this method, I have separated Ms. Snow's individual claim for the time that she has spent as a private practitioner in this action and calculated an award according to the traditional method of *Northcross*. A reasonable "market value" fee in the Detroit metropolitan area for an individual with the skills and expertise of Ms. Snow is $75 an hour. Since the number of hours are reasonable, a total award of $2,936.25 is made to her for 39.15 hours of work.

The remaining hours of work for each attorney were calculated by the formula adopted in this opinion. Since the goal of this method is to compensate the public interest law groups for the cost of provid-

4. For the purposes of this calculus, "overhead" encompasses all costs to the organization except attorney's salaries.

5. For example, using an easy illustration, assume a $2,000,000 overhead for forty attorneys. The litigator spent 400 hours of 1600 hours on the case before the court and received a salary

of $20,000. The hourly fee would be calculated:

$$\frac{\$2,000,000 \div 40}{1600} + \frac{\$20,000}{1600} = \$31.25 + \$12.50 = \$43.75 \text{ per hour}$$

6. Using this method with the example in footnote 5, *supra*, the arithmetic is as follows:

$$\frac{\frac{400}{1600} \times \$20,000 + \frac{400}{1600} \times \frac{\$2,000,000}{40}}{400} = \frac{\$5,000 + 17,500}{400} = \$43.75$$

ing attorneys, I have not deleted any hours as duplicative. Although duplicative hours are usually omitted, the "reasonable" market value fee that is used will normally account for a certain amount of duplication of services and consultation with other attorneys. Under this method, unlike the traditional one, no extra money exists after costs out of which to recover for certain necessarily duplicative activities. I also reason that two attorneys were necessary in this case and some hours that appear duplicative upon a cursory inspection are not so in reality. On several occasions Ms. Snow and Ms. Magid were called upon to visit their clients to inform them of the progress in the case. In order to facilitate the distribution of the information, the prison population was divided into groups and Ms. Snow and Ms. Magid each spoke with different groups. Similar distribution of labor was made all through the course of this litigation, a fact which is not immediately apparent to someone who is unfamiliar with the course of the litigation. For the same reasons I have allowed recovery for the hours that Ms. Snow and Ms. Magid did not include in their calculation of attorney fees by the traditional method. I understand that this deduction was done to help decrease the amount of attorney fees, but since I have adopted a new approach, these fees should correctly be awarded under the theory of "compensation."

I have disallowed for twelve (12) hours of work performed by law clerks at Wayne County Neighborhood Legal Services and nine (9) hours at Michigan Legal Services since their salary is included in the calculation of overhead.

I have allowed full amounts to be claimed for the costs incurred by both public interest law groups as a part of this litigation, totaling $1,522.90 for Michigan Legal Services and $670.64 for Wayne County Neighborhood Legal Services.

The final question is whether interest should be awarded on the attorney fees. The practice is by no means uniform and may depend on whether current or historical rates have applied. In the United States District Court for the District of Columbia, the court chose to apply current hourly rates to fees assessed over an eight-year period. *In re Ampicillin Antitrust Litigation*, 81 F.R.D. 395, 402 (D.D.C.1978). The rationale was that the "inflationary loss suffered by the attorneys because of the long delay in the recovery of their fees" was compensated by an award of current rates and eased the court's task in the calculation. *See also, McPherson v. School District # 186*, 465 F.Supp. 749 (S.D.Ill. 1978), where the court awarded current hourly rates to compensate for increasing overhead and inflationary factors. *Accord, International Travel Arrangers, Inc. v. Western Airlines, Inc.*, 623 F.2d 1255 (8th Cir.), *cert. denied*, 449 U.S. 1063, 101 S.Ct. 787, 66 L.Ed.2d 605 (1980); *Mader v. Crowell*, 506 F.Supp. 484 (M.D.Tenn.1981); *Fitzpatrick v. Bitzer*, 455 F.Supp. 1338 (D.Conn.1978), *on remand from* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976); *New York v. Darling-Delaware*, 440 F.Supp. 1132 (S.D.N.Y.1977).

Other courts have calculated attorney fees on the basis of historical rates but, in recognition of inflationary factors and the delay in receipt of funds, have awarded an additional sum to compensate for these factors. For example, in *Vecchione v. Wohlgemuth*, 481 F.Supp. 776 (E.D.Pa.1979), an additional ten per cent of the calculated fee award was included in the total award "under the rubric of contingency to account for the delay in receipt of payment." 481 F.Supp. at 790. *See also, Keith v. Volpe*, 501 F.Supp. 403 (C.D.Cal.1980); *Clarke v. Amerada Hess Corp.*, 500 F.Supp. 1067 (S.D. N.Y.1980); *Aamco Automatic Transmissions, Inc. v. Taylor*, 82 F.R.D. 405 (E.D.Pa. 1979). There appears to be no standard method to calculate these awards since some decisions conclude that a percentage of the fee is appropriate, such as *Vecchione, supra*, while others appear to arbitrarily award a set sum, as in *Aamco, supra*. *But see, Allen v. Terminal Transport Co.*, 486 F.Supp. 1195 (N.D.Ga.1980), *aff'd without opinion*, 638 F.2d 1232 (1981), *aff'd remanded sub nom. United States v. Terminal*

*Transport Co.*, 653 F.2d 1016 (5th Cir. 1981); *Imprisoned Citizens Union v. Shapp*, 473 F.Supp. 1017 (E.D.Pa.1979); and *Meisel v. Kremens*, 80 F.R.D. 419 (E.D.Pa.1978), where no additional awards were requested and the courts failed to make such an award *sua sponte*.

I have preferred a more accurate approach than either of these throughout this opinion and I believe that under my method of calculation, interest should normally be awarded to compensate for the delay in payment and inflation. The United States Court of Appeals for the Fifth Circuit reached a similar conclusion in *Gates v. Collier*, 616 F.2d 1268 (5th Cir. 1980), *rehearing granted*, 636 F.2d 942 (5th Cir. 1981). By construing the Civil Rights Attorney's Fees Act broadly, the court concluded that although Congress did not explicitly state that interest on attorney fees should be awarded, recovery of interest was consistent with the purpose of the Act. It reasoned, as I do:

> In analyzing the nature of the interest award, it must be understood that the awarding of interest is in no sense a windfall. Because a dollar today is worth more than a dollar in the future, "the only way [a party] can be made whole is to award him interest from the time he should have received the money." *Louisiana & Arkansas Railway Co. v. Export Drum Co.*, 359 F.2d 311, 317 (5th Cir. 1966). Indeed, this case dramatizes the need for interest on attorneys' fees if the attorneys for the prevailing party are to be adequately compensated. Most of the fees at issue in this case were awarded in 1973. Because of inflation, these awards are worth far less today than they were seven years ago. Had the awards been made in 1973, the attorneys could have been drawing interest on that amount for the last seven years.

(Footnote omitted). 616 F.2d at 1276.

In addition to these reasons, the court in *Johnson v. Summer*, 488 F.Supp. 83 (N.D. Miss.1980), awarded interest on the attorney fees because to do otherwise would be to frustrate the deterrent effect that the award was meant to have.

The history of this litigation demonstrates that, despite the provision for fee-shifting created in § 1988, the ability of a private individual to enforce the civil rights statute is impaired by the opposing resources of the State. If an attorney knew that an order of this court providing for reasonable fees were to remain unenforced for well over a year, while the defendant continues to oppose the claim through the appellate process and by other means, that attorney might be deterred from handling any form of *pro bono* litigation. This court believes that such a result is clearly contrary to the purposes of the 1976 amendment to § 1988.

. . . This court believes that an award of interest on attorney's fees under § 1988 is consistent with this rationale, for it will help to counter the deterrence of otherwise competent and eager counsel from participating in protracted litigation, and it will also "fairly place the economical burden" faced by a prevailing party and his counsel where the fee award remains unpaid for an excessive length of time.

488 F.Supp. at 87.

I agree with the concerns of both courts. Additionally, the length of time involved to try complex cases often precludes a determination of attorney fees until long after the initial expenditures were made and interest should be awarded for the delay in payment. Indeed, in this case, over five years have elapsed since suit was begun and there has been an eighteen-month interval between the opinion and the entry of a final order implementing the remedial actions to be taken by defendants.

In this instance, however, I choose to exercise my discretion and deny interest on the fee award. I am aware that the award will be made from the coffers of the State Treasury, not an individual or private entity. As such, I cannot be blind to the quandary in which the State of Michigan now founders. By doing so, I do not mean to condone the discriminatory actions of the State that I found to be present in this

lawsuit nor should my denial of interest be misinterpreted as a tacit disapproval of awards to public interest law groups. However, I find that the State will be deterred by the award of attorney fees and the organizations will be compensated to a large extent for their costs in bringing the suit. Almost $17,600 would be accrued at a six per cent interest rate calculated simply from the end of each calendar year and, although such a sum is sizable to the groups involved, it is also very sizable to a state that is struggling against an eroding tax base and a depressed economy that strongly affects the northeastern industrial states.

*Conclusion*

Having determined that costs and attorney fees are appropriate in this instance, the following is a summary of the award.

Wayne County Neighborhood Legal Services

| | | |
|---|---|---|
| Attorney Fees for Judith Magid | | $41,927.98 |
| Costs | | 670.64 |
| | Total | $42,598.62 |

Michigan Legal Services

| | | |
|---|---|---|
| Attorney Fees for Charlene Snow | | $45,881.55 |
| Costs | | 1,522.90 |
| | Total | $47,404.45 |

| | |
|---|---|
| Charlene Snow | $ 2,936.25 |

| | |
|---|---|
| Total Award | $92,939.32 |

An appropriate order may issue.

### APPENDIX A

Charlene Snow

Annual billable hours were calculated as follows:

| | | |
|---|---|---|
| 52 weeks x 35 hours per week | = | 1820 hours |
| less vacation leave – 25 days x 7 hours | = | 175 |
| less paid holidays – 12 days x 7 hours | = | 91 |
| less personal leave – 4 days x 7 hours | = | 28 |
| less sick leave – 15 days x 7 hours | = | 105 |
| work hours per year | | 1421 |
| less 25% factor for non-billable hours* | | 355 |
| yearly billable hours | | 1066 |

According to my methodology, the hourly rates that I have determined to be reasonable are as follows:

1977 $\frac{14,690}{1,066} + \frac{181,983 \text{ divided by } 5}{1,066}$

$13.78 + 34.14 = 47.92$

1978 $\frac{14,900}{1,066} + \frac{186,318 \text{ divided by } 5}{1,066}$

$13.98 + 34.96 = 48.94$

1979 $\frac{17,900}{1,066} + \frac{245,257 \text{ divided by } 4.5}{1,066}$

$16.79 + 51.13 = 67.92$

1980 $\frac{19,500}{1,066} + \frac{402,757 \text{ divided by } 5}{1,066}$

$18.29 + 75.56 = 93.85$

1981 $\frac{21,000}{1,066} + \frac{386,500 \text{ divided by } 4}{1,066}$

$19.70 + 90.64 = 110.34$

* While this is an estimate, it is based upon program priorities and the fact that a significant portion of time is required to be spent on non-billable activities. Activities priorities are:

| | | |
|---|---|---|
| a. | impact representation | 40% |
| b. | coordination and information dissemination | 20% |
| c. | litigation, advice support to local programs | 20% |
| d. | training | 10% |
| e. | group representation | 10% |

The 25% factor assumes much of the coordination and information, and training activities would not be billable and that there is a certain amount of down time that has to be factored in.

Multiplying Ms. Snow's hourly rate by the number of hours billed, I calculate the following annual awards:

| | | | |
|---|---|---|---|
| 1977 | $47.92 x 93.25 hours | = | $ 4,468.54 |
| 1978 | $48.94 x 245.15 hours | = | 11,997.64 |
| 1979 | $67.92 x 142.6 hours | = | 9,685.39 |
| 1980 | $93.85 x 191.3 hours | = | 17,953.51 |
| January 1981 through February 1981 | $110.34 x 16.1 | = | 1,776.47 |
| Total | 688.4 hours | | $45,881.55 |

Judith Magid

Annual billable hours were calculated as follows:

| | |
|---|---|
| 52 weeks x 35 hours | 1,820 |
| less vacation days – 20 x 7 | 140 |
| less sick and personal days – 30 x 7 | 210 |
| less holidays – 13 x 7 | 91 |
| yearly billable hours | 1,379 |

I calculated the following hourly rates:

1976 $\frac{17,045.59}{1,379.00} + \frac{1,068,896 \text{ divided by } 37}{1,379.00} = 33.31$

$12.36 + 20.95$

1977 $\frac{18,289.75}{1,379.00} + \frac{1,383,142 \text{ divided by } 35}{1,379.00} = 41.92$

$13.26 + 28.66$

1978 $\frac{22,499.88}{1,379.00} + \frac{1,956,861 \text{ divided by } 35}{1,379.00} = 56.86$

$16.32 + 45.37$

1980 $\frac{22,499.88}{1,379.00} + \frac{2,064,488 \text{ divided by } 37}{1,379.00} = 56.78$

$16.32 + 40.46$

1981 $\frac{30,786.34}{1,379.00} + \frac{2,485,643 \text{ divided by } 35}{1,379.00} = 73.83$

$22.33 + 51.50$

Applying the hourly rate to the number of hours billed, I calculate the following annual awards:

| Year | Rate | | Hours | | Amount |
|------|------|---|-------|---|--------|
| 1976 | $33.31 | x | 17 hours | = | $ 566.27 |
| 1977 | 41.92 | x | 116.75 | = | 4,894.16 |
| 1978 | 56.86 | x | 203 | = | 11,542.58 |
| 1979 | 61.69 | x | 215.05 | = | 13,266.43 |
| 1980 | 56.78 | x | 167.75 | = | 9,524.85 |
| 1981 | 73.83 | x | 28.9 | = | 2,133.69 |
| Total | | | 748.45 hours | | $41,927.98 |