Roland **NORDQUIST**

v.

**UDDEHOLM CORPORATION.**

**Civ. No. H–83–847 (MJB).**

United States District Court,
D. Connecticut.

Aug. 15, 1985.

---

Gregg D. Adler, Kestell, Pogue & Gould, Hartford, Conn., for plaintiff.

Albert Zakarian, Felix J. Springer, Day, Berry & Howard, Hartford, Conn., Robert S. Fischler, Shearman & Sterling, New York City, for defendant.

## RULING ON DEFENDANT'S MOTION FOR JUDGMENT IN ACCORDANCE WITH ITS MOTION FOR A DIRECTED VERDICT AND PLAINTIFF'S MOTION FOR RECONSIDERATION OF THIS COURT'S DECISION TO DIRECT A VERDICT IN FAVOR OF THE DEFENDANT ON THE ISSUE OF WILLFULNESS

BLUMENFELD, Senior District Judge.

This case, in which the plaintiff claims that he was discharged by the defendant Uddeholm Corporation because of his age, in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621–634, was tried before a jury on March 19 and 20, 1985. At the close of the plaintiff's case, on March 20, 1985, the defendant moved for a directed verdict. This court denied the motion for a directed verdict with respect to the underlying claim of age discrimination, but explicitly stated that an ultimate decision on that point by the court would be reserved until the jury first had an opportunity to pass on the question. Following that ruling the defendant rested its case without calling any witnesses. The defendant then made a motion for a directed verdict with respect to the issue of willfulness, which this court granted. Following summations and the court's charge, the case was submitted to the jury on March 20, 1985. On March 22, 1985, the court discharged the jury because it had been unable to reach a unanimous verdict.

The court specifically indicated that it would consider the defendant's motion for a directed verdict again after receiving the trial transcript. On March 29, 1985, the defendant formally renewed its motion for a directed verdict, and on April 1, 1985 the plaintiff moved that this court reconsider its decision to direct a verdict against the plaintiff with respect to the question of willfulness. These are the motions presently before the court.

### FACTS

The plaintiff, Roland Nordquist, was employed by the defendant, Uddeholm Corporation, a steel company headquartered in Totowa, New Jersey, in various sales management positions from June 13, 1965 until October 14, 1981, when he was discharged. At the time of his discharge Mr. Nordquist was 58 years old and had been with the company for nearly 17 years. The individual who recommended Mr. Nordquist's discharge, Mr. Steve Pandolfo, was about 33 years old at the time of the discharge and had been Mr. Nordquist's supervisor for about one-and-a-half years prior to the discharge. Mr. Pandolfo did not testify at the trial.

Mr. Nordquist's position when he started with Uddeholm was Regional Manager of Tool Steel, working out of Chicago. After a little less than three years Mr. Nordquist was promoted to the position of District Manager for New England. He served in that position from April 1968 to October

1979. His duties as District Manager included the daily management of the operation of Uddeholm's South Windsor Branch, the sale of some of Uddeholm's accounts in New England, and the management of three outside salesmen who worked out of the branch. Mr. Nordquist testified that during his tenure as District Manager of Uddeholm's New England (or South Windsor) branch, the sales volume went from $578,000 in 1969 to almost $2,000,000 in 1979. He also testified that during this period the branch went from losing close to $100,000 a year to making a profit of nearly $160,000. Furthermore, Mr. Nordquist testified that during the time he served as New England District Manager, he personally developed virtually all of Uddeholm's major accounts in the New England area.

During the fall of 1979, Mr. Nordquist's position with Uddeholm changed when he was appointed "National Accounts Manager and Training Advisor." In this new position, Mr. Nordquist was to concentrate on the larger national accounts, develop distributor accounts, and take over responsibility for training new sales people. As National Accounts Manager and Training Advisor, Mr. Nordquist had no managerial responsibility for any outside salesmen.

In 1980, Uddeholm, like other steel companies, faced a difficult economic and competitive climate. Sales and profits were down and plant closings, layoffs, and terminations were commonplace. In an attempt to improve its situation, in 1980 Uddeholm hired a consulting firm, McKinsey & Company, Inc., to analyze its business. In November 1980, McKinsey issued a report to Uddeholm recommending that certain organizational changes be made.

Specifically, McKinsey recommended that Uddeholm reorganize its branch system and implement a regionalized selling system. The branch system involved 25 branches throughout the country, each one a separate profit and loss center with its own manager and sales force. McKinsey recommended that three geographic regions (East, Midwest, and West) be created and that each have one central branch and one manager responsible for the profit and loss of the entire region. As part of the regionalization, McKinsey recommended that every salesman be assigned accounts in one region exclusively. McKinsey also recommended that Uddeholm focus on smaller accounts that it could serve profitably and move away from the larger, more price-sensitive accounts that Mr. Nordquist was handling.

In early 1981, Uddeholm implemented McKinsey's recommendations. It closed down many local branches and eliminated many jobs. Salesmen who remained were assigned to one region only. Contemporaneous with this reorganization the 18 accounts that Mr. Nordquist was handling in the Midwest (Chicago, Detroit and Cleveland) were assigned or transferred to the new Midwest Regional Manager, Dave Ryder. Mr. Ryder had been hired by Uddeholm on May 6, 1981 and was 33 years old at the time he received the accounts from Mr. Nordquist. The accounts Mr. Nordquist was told to transfer to Mr. Ryder amounted to about 40% of Mr. Nordquist's work at the time.

After the transfer of his Midwest accounts, Mr. Nordquist was assigned exclusively to the East region where he lived and where the majority of his remaining accounts were located. Although after the transfer of the Midwest accounts he was selling exclusively in the East region, plaintiff's title, National Accounts Manager and Training Advisor, did not change.

Some time between January and June of 1981, after Mr. Nordquist's Midwest accounts were transferred to Mr. Ryder, and after Mr. Nordquist had been assigned to the East region exclusively, 14 new accounts and prospects in the New England area were assigned to him. These 14 accounts were intended to replace the 18 Midwest accounts that Mr. Nordquist had been told to transfer to Mr. Ryder. These 14 accounts were transferred to Mr. Nordquist from another salesman in the East region, Andy Edlund.

As of June 1981, Mr. Nordquist was responsible for a total of 34 accounts: the 14

accounts which he had received from Andy Edlund, another 14 large accounts that Mr. Nordquist had previously been covering in New England, and six accounts in the Pittsburgh, Pennsylvania area which had been reassigned from Eastern District Manager Nino Tamburello when Mr. Nordquist first became National Accounts Manager.

Soon after Mr. Nordquist's responsibilities were realigned, he had a series of meetings and discussions with his supervisor, Steve Pandolfo, who was the East Region Manager. Soon thereafter, Mr. Nordquist received the only written criticism directed to him which was put in evidence. This was a written memorandum from Steve Pandolfo dated August 4, 1981, in which Mr. Pandolfo expressed some concern that the number of sales calls Mr. Nordquist had proposed to make over the coming year were too few to justify the time of one full man, and in which Mr. Pandolfo requested that Mr. Nordquist provide him with certain "permanent account records" by August 21, 1981. The memo of August 4, 1981 was admitted in evidence as Plaintiff's Exhibit 21. In addition to the memo he sent to Mr. Nordquist, Mr. Pandolfo wrote several memoranda to Bengt Sandberg, a vice-president of Uddeholm, marked "confidential" or addressed to "file" which were not shown to Mr. Nordquist until after this litigation was commenced. These documents were admitted in evidence as Plaintiff's Exhibits 36, 37, and 38. The primary concerns expressed by Mr. Pandolfo in these documents were whether Mr. Nordquist's capacity was being satisfactorily utilized in view of the number of sales calls Mr. Nordquist was projecting for the next year, and Mr. Nordquist's use of Mondays and Fridays to do paper work and make telephone calls at his office in his home. There was also a concern expressed about Mr. Nordquist's tardiness in providing Mr. Pandolfo with certain "permanent account records."

The memoranda reflect that, at least for purposes of the written records he was keeping, Mr. Pandolfo was dissatisfied with Mr. Nordquist's utilization level. In Plaintiff's Exhibit 37, a September 9, 1981 memorandum to Bengt Sandberg, Mr. Pandolfo recommended that Mr. Nordquist be discharged. As a result of that recommendation Mr. Nordquist was discharged on October 14, 1981.

As of the time Mr. Nordquist was discharged, 28 of his 34 accounts were in the New England territory. The other six accounts were the Pennsylvania accounts that Mr. Nordquist had received from Nino Tamburello. Those six accounts were reassigned to Mr. Tamburello after Mr. Nordquist's discharge. As far as the New England accounts are concerned, the evidence was that the remaining salespeople covering the New England area were Russ Boehle, who was in his early thirties, and Andy Edlund, who was in his late thirties, at the time of Mr. Nordquist's discharge. At that time Mr. Boehle had been with the company about four or five years, and Mr. Edlund had been with the company about nine or ten years. While it is not clear, there is some evidence that the 14 New England accounts that Mr. Nordquist had received from Mr. Edlund were reassigned to Mr. Edlund. There is also some evidence that as to the remaining 14 New England accounts, some of them went to Mr. Edlund. In any event, there was ample evidence from which a jury could reasonably infer that the 28 New England accounts that Mr. Nordquist had at the time he was discharged were all reassigned to either Mr. Edlund or Mr. Boehle.

In early 1982, within five months after Mr. Nordquist was discharged, Uddeholm attempted to hire a skilled salesman with a following in New England. Advertisements for that position were placed in the Boston Globe, photocopies of which were admitted as Plaintiff's Exhibit 25 in evidence. Mr. Tamburello testified that within two or three weeks after Uddeholm had decided to advertise for the position, he had suggested to Mr. Pandolfo that Mr. Nordquist should be rehired because Mr. Nordquist had the qualifications that Uddeholm was looking for. The suggestion was ignored. However, in the summer of 1982 Mr. Nordquist did in fact apply for the

position that was advertised. He was informed that Uddeholm had decided not to fill the position.

At the time of Mr. Nordquist's discharge from Uddeholm in October of 1981, his annual salary was $38,200. Mr. Nordquist eventually obtained new employment in October of 1982 with Electralloy, Inc., just seven months after his severance payments from Uddeholm ceased at the end of February 1982. Mr. Nordquist earned $29,334 in 1982 (from sources including Uddeholm, Electralloy, and from his own business, Nordquist Associates), $44,582 in 1983, and $58,592 in 1984. He seeks back pay damages for the seven months he was unemployed during 1982.

## DISCUSSION

In its memorandum in support of its motion for a directed verdict the defendant articulated three reasons why this court should grant its motion. First, it argued that the plaintiff failed to establish a prima facie case. Second, it argued that even if the plaintiff had established a prima facie case the plaintiff failed to offer adequate evidence that Uddeholm's articulated non-discriminatory reasons for the plaintiff's discharge were merely a pretext for discrimination. Third, the defendant argues that the plaintiff suffered no back pay damages and that the plaintiff is not entitled to prospective ·damages in this case.

The defendant's arguments will be examined in the order in which they were articulated. The standard to be applied in deciding a motion for a directed verdict is whether "the evidence, viewed in the light most favorable to the non-movants without considering credibility or weight, reasonably permits only a conclusion in the movants' favor." *Pena v. Brattleboro Retreat*, 702 F.2d 322, 323 (2d Cir.1983); *Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 573 (2d Cir.), *cert. denied*, 459 U.S. 838, 103 S.Ct. 86, 74 L.Ed.2d 80 (1982); *Simblest v. Maynard*, 427 F.2d 1, 4 (2d Cir.1970); *see also Hagelthorn v. Kennecott Corp.*, 710 F.2d 76, 82 (2d Cir.1983). In examining the evidence with regard to each of the defend-

ant's asserted bases for a directed verdict, the court must give the non-moving party, here the plaintiff, "the benefit of all reasonable inferences which may be drawn in his favor from that evidence." *Simblest*, 427 F.2d at 4; *see also Lebrecht v. Bethlehem Steel Corporation*, 402 F.2d 585, 589 (2d Cir.1968).

### I. *Did the Plaintiff Establish a Prima Facie Case?*

██ A prima facie case is established in a claim under the ADEA if the plaintiff proves the following elements: (1) that he was between the ages of 40 and 70 at the time he was terminated; (2) that he was qualified for the position he held; (3) that he was dismissed despite his qualifications; and (4) that he was replaced, at least in part, by a substantially younger employee, or that the employer kept the position open or sought applicants to fill the position. *See Stanojev v. Ebasco Services, Inc.*, 643 F.2d 914 (2d Cir.1981); *Haskell v. Kaman Corp.*, 743 F.2d 113 (2d Cir.1984); *Geller v. Markham*, 635 F.2d 1027 (2d Cir.1980), *cert. denied*, 451 U.S. 945, 101 S.Ct. 2028, 68 L.Ed.2d 332 (1981). *See also McDonnell Douglas v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *Mieri v. Dacon*, 759 F.2d 989, 995–96 (2d Cir.1985).

██ There is no dispute that the plaintiff presented sufficient evidence of the first three elements necessary to establish a prima facie case. The defendant's argument that the plaintiff failed to establish a prima facie case focuses only on its assertion that the plaintiff failed to prove that "he was replaced or that his work was taken over by a new employee after he was discharged." *Stanojev*, 643 F.2d at 920. The question for the court, therefore, is whether the evidence, viewed in the light most favorable to the plaintiff without considering credibility or weight, reasonably permits only the conclusion that the plaintiff was not replaced, at least in part, by a substantially younger employee, that Uddeholm did not keep the plaintiff's position open, and that Uddeholm did not seek appli-

cants to fill the position. It is at this point that an examination of the evidence is appropriate.

There is ample evidence on the record from which a jury could reasonably infer facts necessary to prove the fourth element of a prima facie case. While there was no evidence that a new employee was hired to take over Mr. Nordquist's work, there is evidence that Mr. Nordquist was replaced, at least in part, by substantially younger employees, by virtue of the fact that there is evidence from which the jury could infer that 28 of the 34 accounts he was managing at the time of his discharge were reassigned to employees in their thirties, who in fact were trained by Mr. Nordquist, while only six of his 34 accounts were reassigned to an employee who was approximately the same age as Mr. Nordquist. It has been repeatedly held that the reassignment of the discharged employee's work to substantially younger employees is sufficient to meet the "replacement" requirement of the fourth element of a prima facie case. *See, e.g., Jacobson v. Pitman-Moore, Inc.,* 582 F.Supp. 169, 175 (D.Minn.1984); *Bower v. State Equipment Division,* 31 F.E.P. Cases 825 (W.D.Pa.1983); *Berkowitz v. Allied Stores,* 541 F.Supp. 1209, 1218 (E.D. Pa.1982).

The defendant has argued in its memoranda that the evidence does not show that Mr. Nordquist's work was for the most part reassigned to younger employees. The basis for the argument is two-fold: First, there was no one who took over the position of National Accounts Manager and Training Advisor, and there was no evidence of who, if anyone, took over Mr. Nordquist's training duties; Second, of the 28 accounts for which there is evidence of reassignment to younger employees, 14 had just recently been transferred to Mr. Nordquist from one of those employees within six months prior to his discharge.

Neither of the defendant's arguments is persuasive. The mere fact that Mr. Nordquist's title was not passed on to any other employee would not preclude a finding that most of the work he was doing was reas-

signed to substantially younger employees. Indeed, the evidence was clear that although Mr. Nordquist retained the title of National Accounts Manager until the time of his discharge in October of 1981, the evidence showed that since approximately May of 1981 Mr. Nordquist was managing accounts exclusively in the Eastern Region. Thus the title he held did not fairly describe the job that he was doing. Accordingly, the lack of evidence that anyone took over a position entitled National Accounts Manager would not represent a failure of proof that Mr. Nordquist's work was reassigned to substantially younger employees. Further, the evidence showed that Mr. Nordquist's training responsibilities took up a minimal amount of his time. Mr. Nordquist's role in his training capacity was described by Steve Pandolfo in his September 9, 1981 memorandum to Bengt Sandberg as "more hit or miss than properly organized" and as "more makeup work than anything else." *See* Plaintiff's Exhibit 37, at 3. While the defendant points to this exhibit as evidence of Mr. Pandolfo's legitimate dissatisfaction with the adequacy of Mr. Nordquist's performance on the job, this exhibit is also evidence that at least up until one month before his discharge Mr. Nordquist's role as Training Advisor could at best be described as peripheral to his major activity of managing accounts. Therefore, any lack of evidence as to who, if anyone, replaced Mr. Nordquist as Training Advisor does not detract from the plaintiff's proof that most of Mr. Nordquist's work was reassigned to substantially younger employees.

The defendant's second argument is equally faulty. The argument essentially is that at least 14 of the 28 accounts that the plaintiff has shown were reassigned to substantially younger employees must be discounted from the calculus because those accounts were originally transferred to Mr. Nordquist from the very employee, Andy Edlund, who was later reassigned to them. The problems with this argument are two-fold: First, the jury is free to look at the reassignment of the accounts for which Mr. Nordquist was responsible at the time of

his discharge without regard to the history of who had previously managed those accounts; Second, even if the jury did go back five or six months prior to the time Mr. Nordquist was discharged, the evidence was clear that the 14 New England accounts Mr. Nordquist received from Mr. Edlund were meant as replacements for the 18 Midwest accounts that Mr. Nordquist had transferred to Dave Ryder, a brand new employee of the company in his early thirties. Thus, whatever view the jury took whether it be the "historical view" of Mr. Nordquist's accounts, or the "time of discharge view," there was ample evidence from which the jury could reasonably infer that the vast majority of Mr. Nordquist's work was reassigned to substantially younger employees.

An additional independent avenue by which a plaintiff can prove the fourth element of a prima facie case of age discrimination is through evidence that the employer sought applicants to fill the plaintiff's position after the plaintiff's discharge. *See Mieri v. Dacon*, 759 F.2d 989, 995–96 (2d Cir.1985). Mr. Nordquist has satisfied the fourth prong of the prima facie case requirement by this avenue as well.

Within six months after Mr. Nordquist's discharge, Uddeholm placed advertisements in the Boston Globe which read in part as follows:

### TOOL STEEL SALES

Large manufacturer of specialty tool steels seeks a sales professional for a Massachusetts territory. Outside tool steel sales experience required.

### TOOL STEEL SALES

Uddeholm Steel Corp.

Seeks aggressive outside salesperson with following. Experience in Boston and Eastern Mass. preferred.

*See* Plaintiff's Exhibit 25. On the basis of Mr. Nordquist's testimony alone the jury could reasonably have inferred that these advertisements were seeking a replacement for Mr. Nordquist. The evidence was clear that Mr. Nordquist had a great deal of outside tool steel sales experience, that he had a following in New England, that he had experience in the New England area, and that all of these factors were integral requirements of the position from which he had been discharged. Further, the plaintiff adduced testimony from Mr. Tamburello, another former Uddeholm tool steel salesman from the New England region, that in his opinion Mr. Nordquist had the qualifications to fill the position that was being advertised and that within several weeks after the ads were run he suggested to Mr. Pandolfo, the person who recommended Mr. Nordquist's discharge that Mr. Nordquist be rehired to fill the advertised position. Given Mr. Tamburello's testimony, in addition to that of Mr. Nordquist, there was ample evidence from which a jury could reasonably infer that Uddeholm had sought applicants to fill Mr. Nordquist's position after his discharge.[1]

In its memoranda in support of its motion for a directed verdict in this case, the defendant makes much of the fact that the advertisements mentioned above were not run until approximately six months after Mr. Nordquist's discharge. The argument associated with that observation is that since there was a six-month lapse of time between the plaintiff's discharge and the defendant's advertisement of an open position strikingly similar to the one involuntarily vacated by the plaintiff, it cannot be reasonably inferred by a jury that the advertisements were seeking a "replacement" for the plaintiff. The defendant, however,

---

1. Although counsel for the defendant represented to the court outside of the presence of the jury that the particular position being advertised was in no way similar to the job that had been held by Mr. Nordquist, the question here is what a jury could reasonably have concluded in view of the evidence that was presented to them. Given the language of the advertisements in the Boston Globe, the description of Mr. Nordquist's duties when he was employed by Uddeholm, and the lack of any evidence from the defendant that the ads were seeking applicants for a position quite unlike that which was held by Mr. Nordquist, a jury could reasonably have concluded that the ads were seeking a replacement for Mr. Nordquist.

is mistaken. In *Powell v. Syracuse University*, 580 F.2d 1150, 1156 (2d Cir.), *cert. denied*, 439 U.S. 904, 99 S.Ct. 576, 58 L.Ed.2d 656 (1978), the Second Circuit held that a gap of two years between the nonrenewal of a teaching contract and the hiring of a new teacher did not preclude the finding of "replacement" in a university context. The court noted that while such a finding might be precluded after a gap of two years in the more common case in which hiring is ongoing and employees are largely fungible, in the context of university employment, where only a small number of individuals are hired each year, the fact that a position may go unfilled for a time does not indicate that the position has been terminated. *Id.* The specialized knowledge required to fill the position from which Mr. Nordquist was discharged and the infrequency of hiring decisions for such a position bring this case well within the ambit of the Second Circuit's holding in *Powell.* This was clearly not the more common case where hiring was ongoing and employees largely fungible.

In light of the above discussion, the defendant's motion for directed verdict, insofar as it rests on a claim that the plaintiff failed to establish a prima facie case, is denied.

## II. *Was There Adequate Evidence of Pretext?*

■ Once the plaintiff in an age discrimination case establishes a prima facie case, the burden then shifts to the employer-defendant to produce evidence of "some legitimate, nondiscriminatory reason" for its conduct. *United States Postal Service v. Aikens*, 460 U.S. 711, 714, 103 S.Ct. 1478, 1481, 75 L.Ed.2d 403 (1983); *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981); *Haskell v. Kaman Corp.*, 743 F.2d at 119 n. 1; *Geller v. Markham*, 635 F.2d at 1032. In this case there is no dispute that the defendant has, primarily through documentary evidence, articulated several nondiscriminatory reasons for the plaintiff's discharge. Simply stated those reasons were that during an extremely difficult business period, during which the defendant had a need to reduce its sales force, the plaintiff was performing his job inadequately and failed to respond to the requests of his supervisor for certain records and reports in a timely manner.

■ Once a defendant offers legitimate nondiscriminatory reasons for the discharge, the burden returns to the plaintiff to show that the articulated reasons were pretextual—that they were not the true reasons for the employer's conduct. *Aikens*, 460 U.S. at 716, 103 S.Ct. at 1482; *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093; *Geller*, 635 F.2d at 1035; *Hagelthorn v. Kennecott Corp.*, 710 F.2d at 82. The plaintiff need not show that the reasons offered by the defendant were false, but only that they were not the only reasons, and that age made a difference. *Hagelthorn*, 710 F.2d at 83. *See also Geller*, 635 F.2d at 1035 (quoting *Laugesen v. Anaconda Co.*, 510 F.2d 307, 317 (6th Cir.1975) (plaintiff entitled to recover if age made a difference, even if need to reduce workforce was "also a strong, and perhaps even more compelling reason."))

■ The plaintiff's burden of proving pretext—that the proffered reason was not the true reason for the employment decision—now merges with the plaintiff's ultimate burden of persuading the trier of fact that he has been the victim of intentional discrimination. The plaintiff in an age discrimination case may succeed in carrying this burden either (1) directly, by persuading the trier of fact that discrimination on account of age more likely motivated the employer; or (2) indirectly, by showing that the employer's proffered explanation is unworthy of credence. *United States Postal Service v. Aikens*, 460 U.S. at 716, 103 S.Ct. at 1482; *Texas Department of Community Affairs v. Burdine*, 450 U.S. at 255–56, 101 S.Ct. at 1094–95.

In view of the fact that this case is presently before the court on the defendant's motion for a directed verdict, the standard to be applied in ruling on the question of the adequacy of the evidence as

regards plaintiff's showing of pretext is whether, viewing the evidence in the light most favorable to Mr. Nordquist without considering credibility or weight, (1) no reasonable jury could conclude that it is more likely than not that discrimination on account of age motivated Uddeholm in its decision to discharge Mr. Nordquist; and (2) that no reasonable jury could conclude that Uddeholm's proffered explanation for Mr. Nordquist's discharge is unworthy of credence. *See United States Postal Service v. Aikens*, 460 U.S. at 716, 103 S.Ct. at 1482; *Pena v. Brattleboro Retreat*, 702 F.2d at 323. The court must be satisfied that both of the prongs of this standard are met in order to grant the motion.[2]

■ Taking the second avenue by which a plaintiff may prove pretext first—by showing that the employer's proffered explanation is unworthy of credence—there is ample evidence in this case from which a jury could reasonably conclude that none of the nondiscriminatory reasons proffered by Uddeholm as being the motivating factor behind Mr. Nordquist's discharge is worthy of credence.

The defendant articulated essentially three nondiscriminatory reasons for Mr. Nordquist's discharge: (1) Mr. Nordquist failed to produce certain records and reports in a timely manner upon the request of his supervisor, Steve Pandolfo; (2) the economic climate was such that the company had a need to reduce manpower; and (3) Mr. Nordquist's performance on the job was inadequate.

There are several exhibits in evidence which deal directly with the question of Mr. Nordquist's compliance with his supervisor's (Steve Pandolfo's) request for certain records. In a memorandum from Steve Pandolfo to the file regarding sales calls with Mr. Nordquist, dated June 9, 10, and 11, 1981, Mr. Pandolfo wrote:

I have also forced him [Mr. Nordquist] to commit himself to proper documentation, including permanent account records, and detailed estimates of the potential of each account which he is responsible for. He doesn't want to do this. He was very frank with me that he feels that if he doesn't have some substantial business under his control then he is totally at the mercy of the company and that we will do away with him. He currently controls about $1,300,000 in business and he has a very fine rapport with his contacts in those accounts.

Plaintiff's Exhibit 36, ¶ 5. Approximately three months later, on September 14, 1981, in a memorandum from Steve Pandolfo to Bengt Sandberg regarding coverage of Mr. Nordquist's accounts subsequent to his anticipated discharge Mr. Pandolfo wrote:

I have recently forced Roland to provide me with updated permanent account records as well as brown sheets for 1982 with his projected sales volumes in anticipation of our eventual decision to terminate him.

Plaintiff's Exhibit 38, at 3, ¶ 3.

On the basis of these exhibits a reasonable jury could conclude that at the very time that Mr. Pandolfo "forced" (or requested) Mr. Nordquist to produce the particular records in question, the request was being made with the anticipation of terminating Mr. Nordquist already in mind. It is easily inferred, therefore, that any procrastination on the part of Mr. Nordquist in producing those records was not a serious or motivating factor in Uddeholm's decision to discharge him. It is also noteworthy that the request for the records which Mr. Pandolfo referred to in his memorandum of September 14, 1981, as being made in anticipation of Uddeholm's eventual decision to terminate Mr. Nordquist, was made some-

---

**2.** On a motion for a directed verdict the fact that at trial the jury was unable to reach a verdict cannot be taken as conclusive of whether either the plaintiff or the defendant met or failed to meet their respective burdens. The test, rather, is what a jury reasonably could have concluded based on the evidence adduced.

It does not follow from the fact that the jury did not find that the reasons offered by the defendant for the plaintiff's termination were not pretextual that there was not sufficient evidence from which a jury reasonably could have made such a finding.

time near or prior to June 11, 1981. A jury could reasonably infer from these references that the company had already known back in June of 1981 that it planned to discharge Mr. Nordquist, and that any conduct on the part of Mr. Nordquist between June 11, 1981 and the date of his discharge in October was not a serious or motivating factor in the company's decision to discharge him.

The second reason articulated by the defendant as a legitimate nondiscriminatory reason for discharging Mr. Nordquist is that economic times were tough and there was a need to reduce the work force. A reasonable jury could conclude, however, that in Mr. Nordquist's case this reason is not worthy of credence in light of the fact that within five or six months after Mr. Nordquist's discharge the defendant company had placed advertisements in the Boston Globe seeking applicants to fill a position which Nino Tamburello described as one for which Mr. Nordquist was qualified. Further, after listening to Mr. Nordquist's testimony and reading the advertisements which were admitted as Plaintiff's Exhibit 25 in evidence, a reasonable jury could have concluded that the company was seeking someone to replace Mr. Nordquist. Accordingly, it would have been reasonable for a jury to conclude that a representation that Mr. Nordquist was fired by virtue of a need to reduce the work force was not worthy of credence.

The third reason articulated by Uddeholm as a legitimate nondiscriminatory reason for Mr. Nordquist's discharge is that Mr. Nordquist's performance on the job was inadequate. The evidence produced at the trial on this issue was conflicting. As noted earlier, Mr. Nordquist testified that between April 1968 and the end of 1979, when he managed Uddeholm's New England branch, the sales volume went from $578,000 in 1969 to almost $2,000,000 in 1979. In addition, the branch went from losing close to $100,000 a year to making a profit of nearly $160,000 in 1979. There was also testimony that during the time he served as New England District Manager, Mr. Nordquist personally developed virtually all of Uddeholm's major accounts in the New England area.

The last performance evaluation given to Mr. Nordquist by Steve Pandolfo prior to the time Mr. Pandolfo recommended that Mr. Nordquist be discharged was in December of 1980. In that evaluation Mr. Pandolfo noted that Mr. Nordquist had an "outstanding ability to relate to clients" and gave Mr. Nordquist a better than satisfactory overall rating. There was evidence that during 1980 Mr. Nordquist was responsible for 63% of Uddeholm's sales in the New England area, and in addition Mr. Nordquist received a $3,000 bonus for his performance during 1980. On January 1, 1981, just six months before Mr. Pandolfo "forced" Mr. Nordquist to turn over the permanent account records in anticipation of Mr. Nordquist's eventual termination, Mr. Nordquist's salary was increased from $35,200 to $38,200. Finally, after Mr. Nordquist was terminated, he received a letter from Uddeholm's Vice President Bengt Sandberg in which Mr. Sandberg described Mr. Nordquist's talent as a salesman as "superior to most, and second to none." Plaintiff's Exhibit 24.

Nino Tamburello, the only other witness who testified aside from Mr. Nordquist, testified that in his 11 years with the company he had never heard anything from any management representative other than Steve Pandolfo which would indicate that Mr. Nordquist was incompetent or not performing satisfactorily.

Based on the testimony of Mr. Nordquist and Mr. Tamburello, as well as the exhibits submitted by the plaintiff, a jury could reasonably have concluded that Mr. Nordquist was well qualified to do his job up to and including the time of his discharge and that he in fact performed his job in an adequate manner. Accordingly, a jury could reasonably conclude that any assertion that the motivating factor underlying the decision to terminate Mr. Nordquist was his inadequate job performance, was not worthy of credence.

Determining whether or not Mr. Nordquist was performing adequately on the job would clearly be a subjective evaluation. The defendant asserts that Steve Pandolfo, Mr. Nordquist's last supervisor at Uddeholm, made that evaluation, determined that Mr. Nordquist was not performing adequately, and as a result of this inadequate performance recommended that Mr. Nordquist be terminated. As counsel for the defendant stated in open court, before the jury, "Mr. Pandolfo's state of mind is very much in issue in this case, as he is the person who, in the first instance, recommended the discharge." (Tr. Vol. I, at 183). The only evidence directly bearing on the state of mind of Mr. Pandolfo, however, was documentary evidence. *See* Plaintiff's Exhibits 18, 21, 36, 37, 38. Mr. Pandolfo, himself, was never called to the stand to testify. The plaintiff, therefore, was not afforded the opportunity to produce evidence of pretext through the normal means—cross-examination of the individual responsible for the discharge decision. Under these circumstances, and perhaps especially in light of defense counsel's declaration before the jury that the state of mind of Mr. Pandolfo "is very much in issue in this case," the plaintiff is entitled to the benefit of every possible inference that the testimony of Mr. Pandolfo, if he were called to the stand, would have been unfavorable to the defendant. *See Karavos Compania Naveira S.A. v. Atlantic Export Corporation*, 588 F.2d 1, 9–10 (2d Cir.1978). Among the reasonable inferences of unfavorable testimony that could be drawn, is that Pandolfo's assertion that Mr. Nordquist was not performing his job adequately was not worthy of credence and/or that that assertion was merely a pretext for the real motivating factor behind the decision to terminate Mr. Nordquist—his age.

In view of the fact that a plaintiff may prove pretext by showing that the employer's proffered explanation is unworthy of credence, and that there is ample evidence in this case from which a jury could reasonably conclude that none of the nondiscriminatory reasons proffered by Uddeholm as being the motivating factor behind Mr. Nordquist's discharge is worthy of credence, the defendant's motion for a directed verdict is denied insofar as it relies on the assertion that the plaintiff failed to put on adequate evidence of pretext. Having put on sufficient evidence from which a jury could reasonably conclude that none of Uddeholm's proffered reasons for Mr. Nordquist's discharge are worthy of credence, the plaintiff need not have put on any direct evidence of pretext, in order to defeat a motion for a directed verdict. *See United States Postal Service v. Aikens*, 460 U.S. at 716, 103 S.Ct. at 1482; *Texas Department of Community Affairs v. Burdine*, 450 U.S. at 255–56, 101 S.Ct. at 1094–95. *See also Thornbrough v. Columbus and Greenville R. Co.*, 760 F.2d 633, 645–47 (5th Cir.1985) (plaintiff is not required to prove that defendant-employer was motivated by bad reasons; in order to prove pretext plaintiff need only persuade the factfinder that the defendant's purported good reasons were untrue).

### III. *Is the Plaintiff Entitled to Back Pay Damages?*

As a third argument in support of its motion for a directed verdict, the defendant contends that as a matter of law Mr. Nordquist is not entitled to any back pay damages. The basis for the defendant's argument is that the essential purpose of damages awards in ADEA cases is compensatory in nature. That is, prevailing plaintiffs should be made whole or restored to the economic position that they would have had but for the intervening unlawful conduct of employers. *See Whittlesey v. Union Carbide*, 742 F.2d 724 (2d Cir.1984); *Rodriguez v. Taylor*, 569 F.2d 1231, 1242–43 (3d Cir. 1977), *cert. denied*, 436 U.S. 913, 98 S.Ct. 2254, 56 L.Ed.2d 414 (1978). Here, the defendant contends that the financial position of Mr. Nordquist is better today than it would have been had he not been discharged by Uddeholm, and it would therefore contravene the compensatory purpose of the ADEA to award Mr. Nordquist back pay.

The factual basis for the defendant's contention that Mr. Nordquist is now in a better financial position than he would have been had he not been discharged is that Mr. Nordquist's actual total earnings during the years 1982, 1983, and 1984 were $132,508; whereas, if he had stayed at Uddeholm, and assuming he would have received an annual increase in salary of $2,500 starting from the base salary of $38,200 which he earned in 1981, he would have earned $129,600 for the years 1982 through 1984 ($40,700 in 1982, $43,200 in 1983, and $45,700 in 1984). This amount is nearly $3,000 less than what he actually earned over the same period.

Neither the plaintiff nor the court has any quarrel with the defendant's assertion that the essential purpose of damage awards in ADEA cases is compensatory in nature. The real issue in dispute is over what time period damages must be calculated in order to determine what is proper compensation. The defendant argues that in order to fashion a "make whole" remedy a court must look at a plaintiff's position at the date the damages are settled and compare it to what his position would have been but for the illegal action of the employer. The plaintiff argues, however, that a victim of discrimination is entitled to recover back pay from the day he is terminated until the day he begins working for another employer at a higher salary, and that earnings received from the subsequent higher paying employer are not deducted from the back pay award. In this case, the record indicates that Mr. Nordquist's severance pay from Uddeholm terminated on February 28, 1982, that he was hired by Electralloy, Inc. for higher pay on October 17, 1982, and that he had no interim earnings during that seven-and-a-half-month period. The plaintiff contends, therefore, that he is entitled to back pay damages for the period between February 28, 1982 and October 17, 1982.

Back pay damage remedies under the provision of the ADEA in question here, 29 U.S.C. § 626(b), have been held to be subject to set-offs of wages actually earned from other employment that could not have been simultaneously performed with the job from which a plaintiff was discharged, despite the absence of express set-off language in the ADEA enforcement provisions. It has been specifically held that the make-whole relief objective is common to both Title VII and the ADEA and will be effectuated only if back pay awards are reduced to reflect alternate earnings. *See, e.g., Rodriguez v. Taylor*, 569 F.2d at 1243 n. 23. "Courts which have considered the applicability of set offs to ADEA awards have uniformly endorsed a set off of at least income earned from interim period employment." *Id.* The question here is what is the appropriate "interim period" to consider—from the date of discharge until the date of employment at equal or higher salary, as the plaintiff contends; or from the date of discharge to the date of trial, as the defendant contends.

The better view is the one put forth by the plaintiff, which has been explicitly adopted by the Fifth Circuit. In *Matthews v. A-1, Inc.*, 748 F.2d 975 (5th Cir.1984), a Title VII case involving employment discrimination on account of sex, the Fifth Circuit held that the district court properly refused to deduct the discharged female employee's earnings at a higher paying position from her damage award, and cited with approval other courts that found that a claim for back pay ceases when the claimant begins to earn more than he had been earning with the defendant-employer. *Id.* at 979.[3] *Cf. Darnell v. City of Jasper,*

---

**3.** It is noteworthy that in *Monroe v. Penn-Dixie*, 335 F.Supp. 231 (N.D.Ga.1971), the court held that damages under the ADEA should "equal the difference between the value of the compensation by way of salary together with other specific monetary benefits, such as increased pension benefits which would have vested *prior to trial* to which plaintiff would have been entitled had

he remained employed by defendant *until the trial date* and the value of his total benefits and earnings at other jobs from his discharge *until the trial date." Id.* at 234–35 (emphasis added) (footnotes omitted). The Second Circuit, however, has characterized the discussion of that court after it ruled that the plaintiff had not stated a cause of action under the ADEA, on

*Ala.,* 730 F.2d 653, 656–57 (11th Cir.1984). In view of the common objectives of the damage remedies for employment discrimination of Title VII and the ADEA, the holdings of the *Matthews* case, and the cases cited therein, are equally applicable here. Thus, the interim period to consider, when calculating any set-off against the back pay damages to which a plaintiff might be entitled, is the period from the date of termination to the date of employment at equal or higher salary if the plaintiff was fortunate enough to obtain such employment prior to the date of trial. In this case, Mr. Nordquist would be entitled to back pay damages for the period between February 28, 1982, the date his severance pay from Uddeholm terminated, until October 17, 1982, the date that he was hired by Electralloy, Inc. Accordingly, the defendant's motion for a directed verdict is denied insofar as it rests on the assertion that Mr. Nordquist is not entitled to or did not suffer any back pay damages.

### IV. *Prospective Damages*

By stipulation dated March 13, 1985, prior to the date of the trial of this case, the parties agreed that the question of equitable relief—reinstatement and/or prospective pension benefits—would be tried to the court in a separate hearing to be held only if and after the jury rendered a verdict for the plaintiff. Consistent with the stipulation, plaintiff presented no evidence concerning the appropriateness of prospective relief nor the amount of such relief.

Notwithstanding the stipulation and the plaintiff's adherence to it at trial, the defendant argues in its motion papers that as a matter of law this is not a proper case for prospective damages. The defendant cites *Whittlesey v. Union Carbide,* 742 F.2d 724 (2d Cir.1984) for the proposition that prospective damages should only be allowed where the fact finder can reasonably predict that the plaintiff "has no reasonable

prospect of comparable alternative employment." *Id.* at 729. The defendant argues that since Mr. Nordquist obtained not merely comparable, but superior employment, under *Whittlesey* any award of prospective damages should be precluded.

■ While the evidence is clear that as far as salary is concerned, Mr. Nordquist's employment at Electralloy, Inc. is superior to what he was earning at Uddeholm, such a comparison is not determinative of whether or not the entire employment benefit package of Electralloy can be said to be "comparable" to that which Mr. Nordquist enjoyed at Uddeholm. Without having heard any evidence on the prospective damages issue this court is not in a position to decide whether or not the two employment packages are comparable. The defendant's interpretation of the proper scope of prospective damages relief under *Whittlesey* is rejected as too narrow.

Furthermore, by stipulation of the parties, which was accepted by this court, the question of Mr. Nordquist's entitlement to prospective damages would only be properly before the court once a jury rendered a verdict in favor of the plaintiff on the liability issue.

Accordingly, the defendant's motion for a directed verdict on the issue of Mr. Nordquist's entitlement to prospective damages is denied.

### V. *The Plaintiff's Motion for Reconsideration*

At the trial of this case on March 20, 1985, this court granted the defendant's motion for a directed verdict on the issue of whether the defendant willfully violated the plaintiff's rights under the ADEA. (Tr. Vol. II, at 37). The plaintiff now seeks a reconsideration of that ruling.

■ In *Trans World Airlines, Inc. v. Thurston,* — U.S. —, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985), the Supreme Court ac-

---

page 234 of that decision, as mere dicta. *See Whittlesey v. Union Carbide,* 742 F.2d 724, 728 (2d Cir.1984). Further, the court in *Monroe* did not specifically consider the situation present

here, that a discharged employee might, prior to the date of trial, be able to obtain employment at higher pay than what he was earning from the employer who illegally discharged him.

cepted the formulation that an ADEA violation is "willful" if "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA." *Id.,* 105 S.Ct. at 625–26. Under this standard it is not necessary for the plaintiff to show that the defendant actually knew that its conduct was illegal, or that the defendant intentionally violated the Act. 105 S.Ct. at 624 n. 19. Indeed, a violation may be willful even where there is no evidence of evil motive or bad purpose. *Id.* The question for this court, therefore, on the plaintiff's motion is whether, when viewing the evidence in the light most favorable to Mr. Nordquist without considering credibility or weight, no jury could reasonably have concluded that Uddeholm either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA.

■ After having the opportunity to closely review the transcript of the trial and the exhibits submitted at trial, and in light of all of the discussion above concluding that the defendant is not entitled to a directed verdict in this case either because the plaintiff failed to establish a prima facie case or because the plaintiff failed to put on adequate evidence of pretext, this court has reconsidered its original decision on the defendant's motion for a directed verdict on the issue of willfulness and finds that a jury could have reasonably concluded that Uddeholm either knew or showed reckless disregard for the matter of whether its conduct, as regards the discharge of Roland Nordquist, was prohibited by the ADEA.

## CONCLUSION

The plaintiff's motion for reconsideration of this court's ruling on the defendant's motion for a directed verdict on the issue of willfulness is granted. The plaintiff's motion for reconsideration having been granted, and this court having reconsidered its ruling on the defendant's motion for a directed verdict on the issue of willfulness, this court's original decision granting the motion is hereby withdrawn and the de-

fendant's motion for a directed verdict on the issue of willfulness is denied.

The defendant's motion for a directed verdict on the alternative grounds that the plaintiff failed to establish a prima facie case, that the plaintiff failed to put on adequate evidence of pretext, that plaintiff suffered no back pay damages, and that this is not a proper case for prospective damages is denied.

In view of the decision herein, this case will be set down promptly for a new trial.

SO ORDERED.